In re the CIRCLE K CORPORATION, Circle K Convenience Stores, Inc., Circle K Management Company, Lar–Lin, Inc., First Circle Properties, Inc., Utotem, Inc., Utotem Markets of Arizona, Inc., U Totem of Alabama, Inc., U–Tote'M of Colorado Inc., U–Tote'M of Miami, Inc., Tic Toc Systems, Inc., Monterre Properties, Inc., Shop & Go, Inc., Circle K General, Inc., Circle K Hawaii, Inc., Combined Aviation Co., Charter Marketing Company (Connecticut), Charter Marketing Company, Mr. B's Oil Co., Inc., Mr. B's Food Mart, Inc., NPI Corporation, Old Colony Petroleum Company, Inc., New England Petroleum Distributors, Inc., and 44th Street & Camelback Limited Partnership, Debtors.

The CIRCLE K CORPORATION, Debtor and Debtor In Possession, Plaintiff,

v.

Stanley MARKS, as Trustee for the Benefit of Cynthia Alice MARKS, Ehud Hubner and Rebecca Weiss a/t/f Keogh Plan, H. Mark Solomon, and Eleanor Werbowsky, Defendants.

Bankruptcy Nos. B–90–5052–PHX–GBN to B–90–5075–PHX–GBN. Adv. No. 90–415–GBN.

United States Bankruptcy Court, D. Arizona.

Nov. 14, 1990.

John J. Dawson, Streich, Lang, Weeks & Cardon, Phoenix, Ariz., D.J. Baker, Weil, Gotshal & Manges, Houston, Tex., Tad R. Smith, Kemp, Smith, Duncan & Hammond, El Paso, Tex., for Jerry C. Bonnett, Bonnett, Fairbourn & Friedman, P.C., Phoenix, Ariz., Joseph H. Weiss, Law Offices of Joseph H. Weiss, New York City, Kevin Yourman, Law Offices of Joseph H. Weiss, Los Angeles, Cal., Jules Brody, Stull, Stull & Brody, Stanley D. Bernstein, Kreindler & Kreindler, New York City, for plaintiffs-debtors.

Bernard M. Gross, Gross & Metzger, P.C., Philadelphia, Pa., for Solomon.

Nadeem Faruqui, Kaufman, Malchman, Kaufmann & Kirby, New York City, for Werbowsky.

Don Dreyfus, Arthur Andersen & Co., Chicago, Ill., for Arthur Andersen & Co.

Jonathan Sack, Cravath, Swaine & Moore, New York City, for Wasserstein, Perella & Co.

Bruce Rabin, Drexel Burnham Lambert, Beverly Hills, Cal., for Drexel Burnham Lambert.

Stephen W. Craig, Brown & Bain, P.A., Phoenix, Ariz., for Karl Eller.

## MEMORANDUM OF DECISION

GEORGE B. NIELSON, Jr.,
Bankruptcy Judge.

This matter having come before the Court on the debtor's request for entry of a preliminary injunction against continued litigation of three consolidated civil actions pending in the United States District Court for the District of Arizona,[1] the request having been prosecuted on the basis of the parties' papers, exhibits, affidavits and declarations, a hearing having been conducted, a preliminary order having been entered on October 16, 1990, and a preliminary injunction having been entered on November 6, 1990, the Court finds and concludes as follows:

### I

It is axiomatic the automatic stay is for the benefit of debtor, debtor's property and the estate. 11 U.S.C. § 362(a). The first inquiry is whether certain insurance policies, covering debtor's present and former directors and officers, are property of the estate. Debtor has two policies: the principal contract provides $10,000,000 in liability and reimbursement coverage; the second is an excess coverage policy for $10,000,000. Adversary Docket No. 60, Exhibits 18 and 19.

The Ninth Circuit has addressed this issue in terms of whether an insurance company can cancel a policy post petition. *In re Minoco Group of Companies*, 799 F.2d 517 (9th Cir.1986). In that case, the bankruptcy court made findings concerning the impact of cancelling the policies:

> [Debtor] would be required to indemnify present and former officers and directors for legal expenses and judgments which arise from their activities as officers and directors. The bankruptcy court also found that cancellation of the policies would render reorganization of Minoco more difficult, if not impossible, for two reasons: (a) the difficulty of attracting

---

1. The actions, *inter alia,* raise claims of securities fraud under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j; Rule 10(b)(5) of the Securities Exchange Commission, 17 C.F.R. § 240.10(b)(5) and A.R.S. § 44–1521, *et seq.* of the Arizona Consumer Fraud Act, against The Circle K Corporation ("debtor"), Karl Eller ("Eller"), former Chairman of the Board and Chief Executive Officer of debtor, who served from 1983 until May 7, 1990, and Robert Reade ("Reade"), who served as debtor's President, Chief Executive Officer and Director until his January 18, 1990 resignation. The consolidated actions are currently pending before the Honorable Stephen M. McNamee, United States District Court Judge for the District of Arizona.

and retaining competent personnel to serve as officers and directors, and (b) the increase in claims against the debtor's estate resulting from claims for indemnification by present and former officers and directors.

799 F.2d at 518.

On the basis of these findings, the bankruptcy court found that cancellation of the policies was stayed. *Id.* The circuit court affirmed on grounds that the bankruptcy petition automatically stayed cancellation. *See* 11 U.S.C. §§ 362(a)(3), 541(a).

The court based this result by finding the insurance policies were estate property, noting § 541(a) was intended to be broad and all-inclusive; an interest is not outside its reach because it is novel, contingent or enjoyment must be postponed. *Id.* Although the insurer argued the policies were not estate property, since they only benefited directors and officers, the court held the policies also benefited the estate as they insured debtor against indemnity claims. 799 F.2d at 519.

In short, the policies met the fundamental test of estate property because "the debtor's estate is worth more with them than without them." *Id.*

As noted by the Fourth Circuit: "A products liability policy ... is a valuable property ... particularly if the debtor is confronted with substantial liability claims within the coverage of the policy in which case the policy may well be ... 'the most important asset of [the] estate.' " *A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 1001 (4th Cir.1986), cited, with approval, in *Minoco, supra,* 799 F.2d at 519. *See also In re Johns–Manville Corp.,* 40 B.R. 219, 229 (S.D.N.Y. 1984). *Cf. Matter of Lockard,* 884 F.2d 1171, 1177–79 and n. 14 (9th Cir.1989) (where contractor's bond is not estate property and no 11 U.S.C. § 105 relief requested, third party litigation not stayed.)

## II

Plaintiff cites *In re Louisiana World Exposition,* 832 F.2d 1391 (5th Cir.1987), to argue the policies are not estate assets. *Louisiana World* appears distinguishable as it primarily focused on director-officer liability coverage, not indemnification coverage. Thus, that court had no need to address the issue confronted by the Ninth and Fourth Circuits: Whether the policy protects against a diminution of estate assets.

There, the unsecured creditors' committee sued directors and officers of debtor and certain insurance companies. Debtor had purchased policies providing payment of legal expenses, liability and indemnification coverage. The policies provided a single total amount of coverage applicable to both indemnification and liability; hence, payment under either reduced coverage under both.

The creditors' committee filed an adversary proceeding to prevent the insurers from paying legal expenses, arguing such amounts were estate assets.

The court of appeals phrased the issue as whether liability proceeds, not indemnification proceeds, were property of debtor's estate. The court concluded they were not, even though debtor owned the policies. What was found to be important was who owned the proceeds; since debtor did not, the proceeds were not estate property. Citing, *inter alia,* the *Minoco Group* decision, the court remarked: "It is true that policies in some of the above-cited cases provided directors' and officers' liability coverage, and indemnification coverage ... and still the cases held that the *policies* were property of the ... estate." *Id.* at 1400 (emphasis in original).

Notwithstanding this, the court emphasized the distinction between owning a policy and owning its proceeds, noting suit was brought on behalf of debtor to *"enlarge* the debtor's estate." *Id.* (emphasis added).

In the other cases, the situation was different:

"The court *stayed* the third-party actions against the directors and officers in part because of the likelihood that their liability coverage would be exhausted. They would then turn to the bankrupt ... for their statutory right to indemnification, and at that point an asset of the estate— the indemnification proceeds—would be

threatened.... The question before those courts was, should the third party suits *against* the debtor and its directors and officers be stayed. The courts answered yes, partly because they considered the indemnification proceeds threatened."

832 F.2d at 1400 (emphasis in original.)

The court concluded: "Here, any payment under the liability coverage reduces the amount of the potential indemnification claim to the same extent that policy amounts available for indemnification are thus reduced. There is not the potential for increasing the estate's exposure by payment of liability proceeds due." *Id.* Finally, the court noted that the committee's claims were not related to the indemnification coverage. The court distinguished *Minoco* by noting that decision only dealt with whether an insurance company could cancel a policy without violating the stay.

As noted previously, *Louisiana World* appears distinguishable, due to its focus on liability rather than indemnification coverage. Further, the *Louisiana World* analysis fails to consider the Ninth Circuit's *Minoco* rationale for holding insurance is estate property: the estate was worth more with than without it. *See Minoco Group,* 799 F.2d at 519, citing Jackson, *Translating Assets and Liabilities to the Bankruptcy Forum,* 14 J. Legal Stud. 73, 99 (1985). If the instant policies only provided coverage for directors and officers, and not indemnification coverage for debtor, the *Louisiana World* case could perhaps be on point.

## III

Here, however, Circle K, like the debtor in *Minoco,* can recover against the policies in limited instances.[2]

First, debtor has previously executed indemnity agreements. On September 9, 1987, debtor executed indemnity agreements with Eller and Reade as an amendment to its bylaws. Debtor's board authorized a similar indemnity agreement at a special meeting held on December 14, 1989. The 1987 and 1989 indemnification agreements allow indemnification and advancement of expenses to the fullest extent permitted or not prohibited by law, including the Texas Business Corporation Act, the Texas Miscellaneous Corporation Law Act or any other applicable law. Although the indemnification language is broad, there are exclusions and debtor has yet to act on the demands of Eller and Reade for indemnification. September 4, 1990 Correction of Deposition Testimony of Joel A. Sterrett, Docket No. 60, at Exhibit 13. Deposition of Gehl Paul Babinec of August 16, 1990, at 36. *Cf.* Deposition of Karl Eller of August 16, 1990, at 70 (stating his belief debtor had agreed to indemnify him for the Arizona securities litigation). Docket No. 54, Exhibits 1 and 2.

Besides the Eller–Reade indemnification claims, debtor reports other claims are pending, or will be made, against the indemnification policies. These include: the *Albrecht* litigation, a California State lawsuit subsequently removed to federal district court in which the insurers have taken the position the litigation is not within the policy period. Sterrett Deposition at 160–72. The *Fleischer* litigation, commenced August 3, 1990, against Eller, Reade, a current director of debtor, and Robert Dearth, debtor's current President and Chief Executive Officer, and the *Weinberger* litigation, an Arizona State stockholders derivative suit against various former and present officers and directors. Debtor has sent notice of suit to the insur-

---

**2.** Both policies are "claims made" policies which offer coverage for claims asserted against the officers or directors within the policy periods. Deposition of Joel Sterrett, Associate Legal Counsel for Debtor, at 153–54. Exclusions include claims for damages, settlements and legal expenses brought about by dishonest or fraudulent acts or omissions, willful violation of statutes, rules or law, attributable to the insured person gaining a personal profit improperly or from shareholder derivative suits or class actions brought by shareholders owning 10% or more of company stock. Besides providing for reimbursement to the insured officers and directors, the policy provides reimbursement to the company "which the Company pays as indemnification to the insured persons during the policy period...." Adversary Docket No. 60, Exhibit 18 at Policy pp. 4–5, ¶ IV(A), (1)–(16).

ance company but has not yet requested a defense. Sterrett Deposition at 157–60.

Second, as in *Minoco, supra,* the insurance policies provide indemnification coverage. In *Minoco,* the insuring clause provided: "[I]f during the policy period any ... claims are made against the Directors or Officers ... for a Wrongful Act, the Insurers shall pay ... all loss for which the Company may be required or permitted by law to indemnify the Directors or Officers." 799 F.2d at 518, n. 1.

In the present case, the pertinent insuring clause provides: "Underwriter will reimburse the Company for the percentage of Loss set forth ... which is in excess of the Deductible ... subject to the Conditions and Limitations (B)(4), which does not exceed the available Limit of Liability and which the Company pays as indemnification to the Insured Persons resulting from any Claim first made against the Insured Persons during the Policy Period ... for a Wrongful Act...." (Insuring Agreement B), Policy p. 1, Docket No. 60, Exhibit 18.

Although the complete insuring clause in the instant case appears riddled with exceptions (as often occurs), the end result is consistent with *Minoco:* In certain instances, debtor can make a claim for reimbursement for indemnification claims paid.

Here, also, the policies protect debtor from diminution of estate assets. The fact that the insurers have reserved their rights not to defend or pay is not unique.[3] The same was true in *In re Johns–Manville Corp.,* 26 B.R. 420 at 429 (S.D.N.Y.1983), *partially reversed on unrelated grounds,* 41 B.R. 926 (S.D.N.Y.1984). The fact debtor may not receive all benefits or proceeds under the insurance does not affect its current status as estate property. *In re Johns–Manville,* 40 B.R. at 230–31. If the insurer fails to provide coverage, the officers will look to debtor's assets for reimbursement, pursuant to the bylaws. 26 B.R. at 429.

Finally, debtor presented evidence concerning the effect of continuing the litigation. Senior Vice President and General Counsel Gehl Paul Babinec testified there is a diminution of the insurance asset when a claim or payout is made, as underwriting considerations go into effect. If the insurance company determines a potential for payout, it reduces availability of debtor's coverage. Babinec Deposition at 151.

Babinec also testified there is an impact on management, debtor's ability to retain management and the willingness of managers to make strong decisions if they lack insurance protection. *Supra,* at 151–52. However hard to quantify, this results in a diminution of the estate.

Similarly, Robert Dearth, debtor's President and Chief Operating Officer, testified the relationship between a company and its directors and officers is fostered by such coverage. If a claim is settled or judgment entered, a reduction or exhaustion of coverage may result. In that event, other directors and officers will be left with reduced, little or no coverage. Additionally, renewals may become more expensive. Deposition of Robert A. Dearth, Jr. of August 22, 1990, Docket No. 54, Exhibit 3.

### IV

Based on the evidence and papers submitted to date, continued prosecution of the District Court security litigation affects debtor's property interests in a valuable estate asset in violation of the automatic stay. 11 U.S.C. § 362(a). As stated in *Robins:* "[A]ctions 'related to' the bankruptcy proceedings against the insurer or against officers or employees of the debtor who may be entitled to indemnification under such policy or who qualify as [an] additional [insured] under the policy are to be stayed under section 362(a)(3)." 788 F.2d at 1001–02. Accordingly, defendants would be required to comply with this Court's General Order 47 to seek relief

---

**3.** Based on the allegations of the District Court complaint, Aetna Casualty and Surety Company took the position in a letter of October 31, 1989, that claims Eller and Reade defrauded stockholders, engaged in dishonest acts, violated stat-

utes and knew, but failed, to disclose that a leveraged buyout or merger was highly improbable, would not be covered by the policy. Adversary Docket 60 at Exhibit 17.

from the automatic stay. 11 U.S.C. § 362(d). Although much evidence in the form of exhibits, documents, affidavits and depositions has been submitted, there has been no evidentiary hearing conducted, corresponding to a final stay relief hearing. Rule 4001(a)(2), *F.Br.R.*

## V

In the alternative, at the very least, debtor has created a substantial issue which enables the Court to utilize § 105 to enjoin plaintiff's prosecution at this early stage in a series of complex, interrelated Chapter 11 filings. Plaintiff has demonstrated that serious questions concerning impact of the District Court litigation on the pending reorganization have been raised, convincing this Court that the balance of hardship tips sharply in its favor. *Lucas v. Bechtel Corp.*, 800 F.2d 839, 847 (9th Cir.1986); *American Passage Media Corp. v. Cass Communications*, 750 F.2d 1470, 1472 (9th Cir.1985).

## VI

In summary, there are similarities here with *In re Johns–Manville Corp., supra,* 26 B.R. at 428–31, where the court extended the automatic stay to enjoin a federal securities action against certain officers and directors of the debtor. There, as in this case, debtor contended insurance currently in force covered reimbursement of the litigation expenses of the officers. Likewise, the insurer reserved its rights to contest such payments. If the insurer fails to pay, the directors and officers will look to debtor for reimbursement pursuant to company bylaws. 26 B.R. at 428–29. In any event, the policies have specific dollar limits beyond which debtor must pay. To the extent expenditures exhaust policy limits, an estate asset is diminished and debtor's exposure in other litigation increases. *Id.* at 429. Finally, here as in *Johns–Manville,* the deposition or trial testimony of debtor's senior executives may be used

against the company subsequently, and debtor expects to have to divert personnel and management to respond to discovery and monitor this litigation to protect its interests.[4]

This is not to suggest the District Court plaintiffs are to be permanently deprived of their right to seek redress. It is not the function of the bankruptcy laws to shelter nondebtors for the entirety of these proceedings. *See American Hardwoods v. Deutsche Credit (In re American Hardwoods),* 885 F.2d 621, 624–25 (9th Cir. 1989); *Seaport Automotive Warehouse v. Rohnert Park Auto Parts (In re Rohnert Park Auto Parts),* 113 B.R. 610, 615 (9th Cir.1990) (bankruptcy court may preliminarily enjoin action against nondebtors but lacks authority to permanently enjoin such litigation.) The Court has been convinced that, at this stage of these complex cases, it benefits debtor, its estate and thousands of creditors not to divert management's attention or resources into equally complex issues involving securities law. While this Court is not the proper venue for such litigation, it could provide a forum for negotiation or settlement, if all parties are willing. If they are not, as circumstances change and the reorganization progresses, the time will come for the litigation to proceed.

---

4. Unsurprisingly, Karl Eller reports he will call "everybody as a witness." Eller Deposition at 176–78. General Counsel Babinec believes that given the broad allegations of the complaint, discovery will involve many senior management officers. Babinec Deposition at 58–141, Docket No. 54, Exhibit 2.