**IN THE UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 92-2731

IN THE MATTER OF:  VITEK, INC.,

                                        Debtor.

CHARLES AND ANN HOMSY,

                                        Appellees,

                          versus

BEN B. FLOYD, Trustee,

                                        Appellant.

Appeal from the United States District Court
for the Southern District of Texas

(April 25, 1995)

Before VAN GRAAFEILAND[*], SMITH, and WIENER, Circuit Judges.

WIENER, Circuit Judge:

     Vitek, Inc. (Vitek) and Plaintiffs-Appellees Charles and Ann
Homsy (the Homsys), as directors and officers of Vitek, were sued
by over 400 plaintiffs, who claimed to have been injured by
allegedly defective prostheses manufactured by Vitek.  As a result,
Vitek filed for bankruptcy protection under Chapter 7.  During the
ensuing bankruptcy proceedings, Defendant-Appellant Ben B. Floyd
(Floyd), the trustee of Vitek's bankruptcy estate (the Estate),

_____

     [*]Circuit Judge of the Second Circuit, sitting by
designation.

petitioned the bankruptcy court for authority to compromise with Vitek's liability insurance carriers. These compromises (the Settlements) provided that Vitek's liability insurance carriers would be protected from third-party suits by injunctive orders of the bankruptcy court in exchange for paying the remainder of the limits of the liability policies (the Policies) to the Estate for the benefit of creditors. The bankruptcy court approved the Settlements, issuing an injunctive order that protected Vitek's insurance carriers from third-party liability.

The Homsys objected, arguing that the Settlements left them exposed to suits while denying them defense and liability coverage under the Policies, despite their being coinsureds with Vitek under the Policies. The bankruptcy court rejected this argument, finding that the Homsys had no property interests in the Policies. The Homsys appealed to the district court, which reversed, holding that the Homsys had independent property rights in the proceeds of the Policies (the Proceeds). The district court remanded the case to the bankruptcy court with orders to extend the protection of its injunctive order to cover the Homsys. Floyd timely appealed to this court, arguing that Vitek's Policies (and the Proceeds) are property of the Estate, and that his authority as trustee to enter into settlements with Vitek's insurance carriers should not be conditioned on extension of the bankruptcy court's injunctive order to cover the Homsys. For the reasons set forth below, we reverse the ruling of the district court; and we modify the original order of the bankruptcy court and reinstate that order as modified.

2

I

FACTS AND PROCEEDINGS

Between 1974 and 1980 Vitek marketed temporomandibular joint (TMJ) implants for persons suffering from TMJ disorders.[1]  Alleged defects in some models of these implants resulted in the filing of numerous lawsuits in many jurisdictions.  Essentially every suit contained allegations that the implants were defective or that Vitek failed adequately to warn consumers of possible dangers attending the use of those implants, or both.  At the time that the events underlying these lawsuits were occurring, the Homsys were officers, directors, and principal shareholders of Vitek.

Vitek filed a voluntary petition for relief under Chapter 7 of the United States Bankruptcy Code, and within days Floyd was appointed acting Chapter 7 Trustee of Vitek's bankruptcy estate. At the time that Vitek filed for bankruptcy approximately 426 lawsuits were still pending against it.  Many of these suits also named one or both of the Homsys as defendants.

The Estate's remaining assets consisted primarily of liability insurance policies purchased by Vitek, a named insured on each of the Policies.  The Homsys were listed either as coinsureds or as additional named insureds under each of the Policies, being covered thereunder as officers, directors, or stockholders of Vitek. Significantly, the Parties to the instant litigation have stipulated that the Homsys are coinsureds in all Policies.  Under

_____

[1]The temporomandibular joint permits a person's jaw to move, thereby allowing the mouth to open and close.

the terms of the Policies, the insurers must both indemnify and defend Vitek and the additional insureds (here, the Homsys) until the policy limits are exhausted.

As Trustee for the Estate, Floyd contacted counsel for plaintiffs in most of these suits, encouraging formation of a confederation, eventually called the Plaintiffs' Steering Committee. Floyd also initiated discussions with representatives of Vitek's several insurance carriers in an effort to obtain and distribute the Proceeds.

Several months later Floyd filed a number of motions with the bankruptcy court seeking authority to compromise with most of Vitek's insurance carriers. Under the terms of these agreements the carriers would be required to remit all remaining Proceeds, up to the limits of their respective policies, in full satisfaction of the carriers' obligations. In return, the carriers would be protected by the injunctive order of the bankruptcy court from incurring additional liability and defense costs. The Homsys objected to these settlements, arguing that as coinsureds they were being deprived of their rights under the Policies: The Homsys were to be enjoined from suing the carriers, but they would not themselves be protected from third-party suits.

The bankruptcy court approved the Settlements, concluding that (1) the Estate was the sole owner of the Policies and the Proceeds, (2) the Settlements were in the best interest of all relevant parties, and (3) the Homsys' interests were adequately protected by their unsecured claims against the Estate. The district court

disagreed, concluding that the bankruptcy court erred when it ruled that the Homsys had no independent property interests in the Proceeds. The district court did not mention corresponding interests in the Policies themselves.

Finding that the Proceeds were owned "by both the Homsys and Vitek because they are coinsureds," the district court concluded that the Homsys' portion of the Proceeds could not be regarded as property of the Estate. Therefore, reasoned the court, the bankruptcy court lacked authority to shield the insurance carriers from liability to the Homsys. The district court also concluded that granting the Homsys an unsecured claim against the Estate did not adequately protect their interests. Despite its determination that the Homsys' interest in the proceeds were <u>not</u> estate property, the district court in remanding the case to the bankruptcy court directed that court to extend its injunction to cover the Homsys.[2] Floyd timely appealed.

## II

## ANALYSIS

This case involves the interfacing of federal bankruptcy law with state insurance law. The central issue here is, when one of two or more coinsureds declares bankruptcy and seeks protection

---

[2]As discussed later, we perceive a contradiction between the district court's conclusion that the Homsys' portion of the Proceeds were not part of the Estate, and that court's instruction that the bankruptcy court extend its injunctive orders to protect the Homsys as well as the Estate.

under Chapter 7,[3] what part of the proceeds of a liability policy that covers the non-bankrupt coinsureds should enrich the estate of the coinsured debtor? The district court attempted to answer this fundamental question by reference to insurance law. Relying on the notion))purportedly grounded in state insurance law))that "[a]n insurance company cannot prefer one of its insureds over another,"[4] the district court reversed the bankruptcy court. In so doing, the court concluded that the Homsys had property interests in the Proceeds even though Vitek was the sole owner of the Policies, and that the bankruptcy court could not therefore effect a settlement that excluded the Homsys from any share of the Proceeds. We consider the bankruptcy and insurance aspects of this case in turn.

A.   Bankruptcy Aspects

The district court correctly noted that under § 541(a)(1) of the Bankruptcy Code, a bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of [a bankruptcy] case."[5] Interpreting this provision, the Supreme Court has declared that "[t]he scope of

---

[3]The issues here considered are more frequently encountered in proceedings in Chapter 11 reorganizations than in Chapter 7 liquidations. Consequently, any analogical crossovers into Chapter 11 jurisprudence is problematical, particularly those Chapter 11 proceedings that implicate mass tort litigation, e.g., asbestos, birth control devices, etc. In the same vein, the precedentialSQor even merely instructionalSQvalue of this opinion to future Chapter 11 cases should probably be "little or none."

[4]A. Windt, Insurance Claims and Disputes, § 5.09 (2d ed. 1988). As noted later, apparently no Texas case either supports or rejects this supposedly well-established principle of insurance law.

[5]11 U.S.C. 541(a)(1).

. . . [§ 541(a)(1)] is broad.  It includes all kinds of property, including tangible or intangible property, causes of action . . . and all other forms of property currently specified in section 70a of the Bankruptcy Act."[6]  The language of § 541(a)(1) is unquestionably broad enough to cover a debtor's interest in liability insurance.[7]  Indeed, an overwhelming majority of courts have concluded that liability insurance policies fall within § 541(a)(1)'s definition of estate property.[8]  This consensus is understandable:  "[a] products liability policy . . . is a valuable property of a debtor, particularly if the debtor is confronted with substantial liability claims."[9]  Often, as in this case, liability policies constitute "the most important asset of . . .  [the debtor's] estate."[10]  As one court put it, "language, authority, and reason all indicate that . . . liability insurance polic[ies] are

_____

[6]United States v. Whiting Pools, Inc., 462 U.S. 198, 204-05 & n.9, 103 S. Ct. 2309, 2313 & n.9, 76 L. Ed. 2d 515 (1983).

[7]Tringali v. Hathaway Machinery Co., Inc., 796 F.2d 553 (1st Cir. 1986).

[8]MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 92 (2nd Cir. 1988); Tringali, 796 F.2d at 560-61; A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 1001-02 (4th Cir. 1986); In re Minoco Group of Cos., Ltd., 799 F.2d 517, 519 (9th Cir. 1986); In re Davis, 730 F.2d 176, 184 (5th Cir. 1984) ("the weight of authority supports the New York district court's conclusion" that insurance policies and their proceeds are property of the estate); In re Circle K Corp., 121 B.R. 257, 259 (Bankr. D. Ariz. 1990) (involving directors and officers' liability policies); In re Forty-Eight Insulations, Inc., 54 B.R. 905, 907-909 (Bankr. N.D. Ill. 1985); In re Johns-Manville Corp., 26 B.R. 405, 436 (Bankr. S.D.N.Y. 1983), aff'd 40 B.R. 219, 230-31 (S.D.N.Y. 1984).

[9]A.H. Robins, 788 F.2d at 1001.

[10]Id. (quoting In re Johns-Manville Corp., 40 B.R. at 229).

7

`property of the estate.'"[11]

In In re Louisiana World Exposition, however, we distinguished titular ownership of a policy from total ownership of the proceeds of that policy,[12] holding that the proceeds of Directors and Officers (D&O) liability insurance policies were not part of a corporation's bankruptcy estate even though the policies were purchased and owned by the corporation.[13] The policies at issue in that case provided liability coverage only for the corporate debtor's directors and officers and for the obligation of the corporation to indemnify those directors and officers.[14] Thus, under the D&O policies, the insurance companies' obligations flowed only to the corporate debtor's directors and officers, who were the only insureds under the policies.[15] The policies did not afford the debtor corporation any direct coverage for liability to third-party claimants.[16] In that narrow factual context, we concluded that the debtor corporation's ownership of the policies was not enough to render the proceeds of those policies property of the corporation's bankruptcy estate. Consequently, despite the debtor's legal ownership of the policies qua policies, this court determined that the directors and officers were the equitable owners of all of the

---

[11]Tringali, 796 F.2d at 560.

[12]832 F.2d 1391 (5th Cir. 1987).

[13]Louisiana World Exposition, 832 F.2d at 1398-1400.

[14]Id. at 1398.

[15]Id. at 1399.

[16]Id.

proceeds of those policies, pretermitting inclusion of the proceeds in the estate of the debtor.

In the time since Louisiana World was decided, the distinction drawn in that case between ownership of liability policies and ownership of the proceeds of those policies has not been broadly applied: It arguably remains confined to cases involving D&O liability policies, given their unique nature among liability insurance products.[17] Faced with the typical situation in which a debtor corporation's liability policies provide the debtor and thus the estate with direct coverage against third party claims, virtually every court to have considered the issue has concluded that the policies))and clearly the proceeds of those policies))are part of debtor's bankruptcy estate, irrespective of whether those policies also provide liability coverage for the debtor's directors

---

[17]But see In re Edgeworth, 993 F.2d 51 (5th Cir. 1993) (holding that the proceeds of a physician's liability policy were not part of the physician's bankruptcy estate). In the Edgeworth opinion, the panel did include some general language that appears to broadly endorse the policy)proceeds dichotomy introduced in World Exposition. For example, the panel suggested that "under the typical liability policy, the debtor will not have a cognizable interest in the proceeds of the policy," because the proceeds truly inure to the benefit of third parties. 993 F.2d at 56. This language was, however, dicta.

More importantly, this language confutes the broad understanding-recognized even in World Exposition))that when a liability policy "provides coverage for judgments against or losses of the bankrupt corporation itself," the debtor owns both the policy and the proceeds of that policy. World Exposition, 832 F.2d at 1399-1400. As indicated infra the vast majority of courts do not bother to distinguish ownership of insurance policies from ownership of the proceeds of those policies, but view that the two go hand-in-hand. Thus, the scope of the policy-proceeds distinction enshrined in World Exposition is still in ferment: whether that distinction will be extended more broadly has yet to be determined.

and officers.[18]  Most courts do not even recognize a technical distinction between ownership of insurance policies and ownership of the proceeds of those policies:  They simply conclude that such policies))and, by implication, the proceeds of such policies))are valuable properties of debtors' bankruptcy estates.[19]

Indeed, some courts that have considered World Exposition's policy-proceeds dichotomy have rejected it because it exposes a debtor's insurance policies to suit outside the ambit of the bankruptcy estate.[20]  These courts evidently fear that splitting the proceeds of a liability policy between bankrupt and non-bankrupt insureds would create a race to the courthouse whenever potential liability exceeds total proceeds, as creditors scurry to see who can be first to get a judgment against the non-bankrupt insureds (worth a dollar on the dollar) instead of a claim against a

---

[18]World Exposition 832 F.2d at 1399-1400 (citing numerous cases).

[19]See, e.g., MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 92 (2nd Cir. 1988); Tringali v. Hathaway Machinery Co., Inc., 796 F.2d 553, 560-61 (1st Cir. 1986); In re Davis, 730 F.2d 176, 184 (5th Cir. 1984); In re Forty-Eight Insulations, Inc., 54 B.R. 905, 907-909 (Bankr. N.D. Ill. 1985); In re Johns-Manville Corp., 26 B.R. 420, 436 (Bankr. S.D.N.Y. 1983), aff'd 40 B.R. 219, 230-31 (S.D.N.Y. 1984).

[20]See, e.g., In re Minoco Group of Cos., Ltd., 799 F.2d 517, 519 (9th Cir. 1986) ("[W]e see no significant distinction between a liability policy that insures the debtor against claims by consumers and one that insures the debtor against claims by officers and directors"); A.H. Robins Co., Inc. v. Piccinin, 788 F.2d 994, 1001-02 (4th Cir. 1986); In re Circle K Corp., 121 B.R. 257, 260, 262 (Bankr. D. Ariz. 1990) ("[T]he Louisiana World analysis fails to consider the . . . Minoco rationale for holding insurance is estate property:  the estate was worth more with than without it").  But see In re Daisy Systems Securities Litigation, 132 B.R. 752, 755 (Bankr. N.D. Cal.).

bankrupt debtor's estate (often worth but pennies on the dollar, if anything).[21]

In this circuit, we are therefore in the position of knowing how to resolve cases on either end of the continuum, but we have not yet decided how to resolve cases lying somewhere along the continuum. On one extreme, when a debtor corporation owns a liability policy that exclusively covers its directors and offices, we know from World Exposition that the proceeds of that D&O policy are not part of the debtor's bankruptcy estate.[22] On the other extreme, when a debtor corporation owns an insurance policy that covers its own liability vis-a-vis third parties, we))like almost all other courts that have considered the issue))declare or at least imply that both the policy and the proceeds of that policy are property of the debtor's bankruptcy estate.[23] But we have not yet grappled with how to treat the proceeds of a liability policy when (1) the policy-owning debtor is but one of two or more coinsureds or additional named insureds, (2) the rights of the

---

[21]Tringali, 796 F.2d at 560; In re Forty-Eight Insulations, Inc., 54 B.R. 905, 908 (Bankr. N.D. Ill. 1985). Such a "race to the courthouse" arguably offends one of the most fundamental policies underlying bankruptcy law: preservation of the debtor's estate and the status quo ante long enough to allow a fair, ratable, systematic liquidation of the estate's assets among all claimants. 796 F.2d at 560.

[22]See generally 832 F.2d 1391.

[23]Id. at 1399-1400; accord MacArthur Co. v. Johns-Manville Corp., 837 F.2d 89, 92 (2nd Cir. 1988); Tringali, 796 F.2d at 560-61; In re Davis, 730 F.2d 176, 184 (5th Cir. 1984); Forty-Eight Insulations, 54 B.R. at 907-909; Johns-Manville Corp., 26 B.R. at 436. But see In re Edgeworth, 993 F.2d 51 (5th Cir. 1991).

other coinsured(s) or additional named insured(s) are <u>not</u> merely derivative of the rights of one primary named insured,[24] and (3) the aggregate potential liability substantially exceeds the aggregate limits of available insurance coverage.

When ultimately we are faced with such a mid-continuum case, we shall have to decide which one of two positions to take: either (1) the proceeds of a liability policy should be wholly included in the bankruptcy estate of the debtor that owns the liability policy))even though there are other coinsureds or additional named insureds who have some "interest" in the proceeds,[25] or (2) the proceeds should be divided among all coinsureds, either per capita or in proportion to the potential or actual liability faced by each insured party. The instant case, however, is not the one that forces us to decide which of these or possibly other positions to take, for here the district court based its reversal of the bankruptcy court on what it perceived to be a broad, general

---

[24]<u>See generally</u> <u>MacArthur Co.</u>, 837 F.2d at 92 (holding that MacArthur Co.'s rights as an insured vendor were "completely derivative" of Manville's rights as the primary insured).

[25]<u>See</u> <u>World Exposition</u>, 832 F.2d at 1400 (acknowledging that some courts have held that the policies))and in fact the proceeds))of an insurance policy were part of a debtor corporation's estate, even though the policies also extended liability coverage to directors and officers); <u>see also</u> <u>In re Minoco Group of Cos., Ltd.</u>, 799 F.2d 517, 519 (9th Cir. 1986) (no significant distinction between a liability policy that insures the debtor against claims by consumers and one that insures the debtor against claims by officers and directors); <u>A.H. Robins Co., Inc. v. Piccinin</u>, 788 F.2d 994, 1001-02 (4th Cir. 1986) (worth of bankruptcy estate increased by including proceeds); <u>In re Circle K Corp.</u>, 121 B.R. 257, 260, 262 (Bankr. D. Ariz. 1990); <u>but see</u> <u>In re Daisy Systems Securities Litigation</u>, 132 B.R. 752, 755 (Bankr. N.D. Cal. 1991).

principle of insurance law; and even if we assume arguendo that such principle is a basic tenet of Texas insurance law, we conclude that the court misapplied it.

B.  Insurance Aspects

As noted, the district court grounded its opinion in what it perceived to be a recognized principle of insurance law, that "[a]n insurance company cannot prefer one of its insureds over another."[26] Armed with this article of faith, the district court concluded that "[t]he bankruptcy court erred when it ruled that the Homsys ha[d] no property interest in the proceeds," and reversed the bankruptcy court.  We discern several difficulties with the district court's determination.

Ignoring for a moment that court's failure to refer us to anything other than a single treatise to support this purported canon of insurance law, we perceive a logical contradiction between the court's legal reasoning and the injunctive relief that it ordered.  Reduced to its essence, the foundation of the district court's reversal of the bankruptcy court's decision was the court's preliminary conclusion that the Homsys owned some portion of the policy proceeds (or some fractional or undivided interest in all of the proceeds) and that the Homsys' portion of or interest in the proceeds was not))and could not be))property of the Estate.[27]

_____

[26]A. Windt, Insurance Claims and Disputes, § 5.09 (2d ed. 1988).

[27]A bankruptcy court exercises its broad powers to protect the assets of the bankruptcy estate.  In re Davis, 730 F.2d 176, 183 (5th Cir. 1984).  The bankruptcy estate, in turn, consists of all legal and equitable interests owned by the debtor at the

13

Nevertheless, the district court went on to order the bankruptcy court to extend "the umbrella of [its] injunction . . . to shield the Homsys from liability and to protect their interest in the policies adequately." But, if the Homsys' portion of the Proceeds is truly <u>not</u> property of the Estate, then the bankruptcy court has no authority to enjoin suits against the Homsys: The bankruptcy court's injunctive powers exist only to ensure the preservation and fair division of Estate assets.[28] Therein lies the apparent contradiction between the district court's legal reasoning and the injunctive relief that it ordered: If the Homsys own a portion of the Proceeds, that portion cannot be deemed property of the Estate; and perforce there can be no justification for shielding such portion under the bankruptcy court's injunctive orders, the reach of which extends only to property of the Estate.

More relevant for our purposes, however, is the failure by either the Homsys or the district court to cite us to any binding authority for the proposition that "[a]n insurance company cannot prefer one of its insureds over another."[29] The district court anchored its opinion on this principle, yet provided us with neither statutes nor case law indicating that the laws of the State

---

commencement of the bankruptcy case. 11 U.S.C. 541(a)(1). By definition, the bankruptcy estate does not generally include property that is <u>not</u> owned by the debtor, <u>see</u> <u>id.</u>, and non-debtor property thus should not ordinarily be shielded by the powers of the bankruptcy court.

[28]<u>In re Davis</u>, 730 F.2d 176, 183 (5th Cir. 1984); <u>see also</u> footnote 27 <u>supra</u>.

[29]A. Windt, <u>Insurance Claims and Disputes</u>, § 5.09 (2d ed. 1988).

14

of Texas embrace such a principle.  Neither did the district court explain exactly how the principle applies in this case.  For their part, the Homsys referred us to two cases))one from New York and one from an intermediate appellate court in Texas))that purportedly support the principle:  <u>Smoral v. Hanover Insurance Co.</u>[30] and <u>Texas Farmers Insurance Co. v. Soriano</u>.[31]  But these cases are distinguishable.

In <u>Smoral</u>, the New York Supreme Court, Appellate Division, held that an insurance company breached its duty of good faith to an insured <u>driver</u> (one of two coinsureds) when it tendered the full limits of an automobile liability policy to a passenger who was injured in a car accident, in exchange for an agreement to release from liability the insured <u>owner</u> of the car (the other of two coinsureds).[32]  Far from standing for a broad principle that an insurer may never prefer one of its insureds over another (and thus may be enjoined from entering a settlement that would do so), however, the <u>Smoral</u> case merely indicates that an insured may seek damages under a breach of good faith cause of action if he believes that an unfair settlement has been effected.[33]

The intermediate appellate court opinion in <u>Soriano</u> likewise

---

[30]37 A.D.2d 23, 322 N.Y.S.2d 12 (1971).  Windt refers to the <u>Smoral</u> case as the "leading case" in the area of defining an insurer's duty to settle when there is more than one insured.  A. Windt, <u>Insurance Claims and Disputes</u>, § 5.09 (2d. Ed. 1988).

[31]844 S.W.2d 808 (Tex. App.))San Antonio 1992) (<u>rev'd</u>, 881 S.W.2d 312 (Tex. 1994).

[32]37 A.D.2d at 26.

[33]<u>See generally</u> <u>id.</u>

15

reveals only that, under some circumstances, an insured may challenge a settlement between his insurer and another party by filing an action for breach of the duty of good faith and fair dealing.[34] We note first that Soriano does not involve a settlement between an insurer and one of two or more coinsureds but between the insurer and one of several third-party claimants. Second, there is now considerable doubt whether Soriano still stands for the proposition for which it was cited to us by the Homsys in the first place: After the instant case was briefed and argued to us on appeal, the Supreme Court of Texas reversed the intermediate appellate court and rendered a take-nothing judgment against the Soriano plaintiffs. In so doing, the state supreme court noted that it had "never recognized a cause of action for breach of the duty of good faith and fair dealing where the insurer fails to settle third-party claims against the insured,"[35] emphasizing that "[w]e have never held and do not hold today that either of these two standards [(1) the insurer has no reasonable basis for denying or delaying payment of the claim, or (2) the insurer knew or should have known that there was no reasonable basis for denying or delaying payment of the claim] applies to insurers in responding to third-party claims."[36] Thus the Homsys' reliance on Soriano is even

---

[34]    844 S.W.2d at 814-17.

[35]    Soriano, 881 S.W.2d at 317.

[36]    Id. (emphasis in original). But, as the insurer in Soriano did not challenge whether, as a matter of law, its insured could advance a claim for breach of the duty of good faith and fair dealing for the company's failure to settle a third-party claim, the Texas Supreme Court was not in a position

16

less efficacious now than it was when cited in their brief to this court.

Nowhere in either <u>Smoral</u> or <u>Soriano</u> do we find true support for a general principle of insurance law that forbids an insurer from settling with one of its coinsureds to the disadvantage of another one. Rather, those cases recognize nothing more than the aggrieved insured's right to seek damages from the insurance company for making such a settlement, by initiating a suit for breach of good faith.[37]

In this case, of course, the Homsys have not initiated such a suit. Relying on nothing more than a general statement in a hornbook, the Homsys))and apparently the district court))would have us convert an insured's right to sue for breach of good faith into a general prohibition that forbids an insurer from entering a settlement by which it tenders the full limits of a liability policy exclusively to or for the benefit of one of several coinsureds. We decline the invitation to expand the holdings of <u>Smoral</u> and <u>Soriano</u> so extensively.[38]

---

to address the existence vel non of such a claim under Texas law; hence its pronouncements and their inferences remain dictum.

[37]The right of an insured to sue his insurer for breach of good faith is analogous to the right of a party to a contract to sue for breach of contract.

[38]We also note that there is a wide divergence of opinion concerning the factual predicate that a court must find to conclude that an insurance company has breached its duty of good faith in concluding a settlement. <u>See, e.g.</u>, <u>Pekin Ins. Co. v. Home Ins. Co.</u>, 479 N.E.2d 1078, 1080, 134 Ill. App. 3d 31 (1985) ("court will only recognize a bad faith claim when an insurer has acted in a vexatious, unreasonable, or outrageous manner towards its insured parties"). Clearly, however, whether an insurance

17

III

CONCLUSION

As we perceive a logical contradiction between what we must infer to be the district court's legal reasoning and the injunctive relief that it ordered, and as neither the Homsys nor the district court advanced compelling support for the proposition that an insurance company may never enter a settlement with one insured while leaving another insured completely exposed, we are unable to affirm the judgment of the district court. We therefore reverse the order of the district court, which itself had reversed the order of the bankruptcy court; and we affirm and reinstate the order of the bankruptcy court, which authorized the Settlements that were proposed by the trustee.[39] In so doing, however, we do

---

company has breached its duty of good faith is a fact-intensive inquiry, and not one for an appellate court acting upon a cold and incomplete record.

[39]In again cautioning our readership against relying on this opinion as precedential or instructive beyond its narrow holding in the context of the particular facts and circumstances of this case, we are constrained to mention several caveats and pose one or two rhetorical questions. We wonder "out loud" about the extent, if any, to which the tools of injunctive relief and settlement (or "compromise") are appropriateSQnot only in dealing with the interests of co-insureds in policy proceeds, but also in dealing with the rights of third party creditors of the bankruptcy and non-bankrupt debtors to the extent any one or more of such third party creditors may oppose the settlement confected by a "steering committee." The broad latitude afforded bankruptcy courts in fashioning remedies should not be used in a way that tramples on the rights of dissenters among creditors or non-parties to the proceedings. Just as § 105 injunctions in mass tort situations are questionable precedent in guaranty and partnership contexts, we also caution against analogical extension of that which we do today to different situations in bankruptcy, such as guaranties and holders of guaranties or partners (distinct from the partnership) in § 723 situations (who appropriately may be enjoined temporarily but who in most

18

not intend to hold or even imply that the Homsys may not have the right to seek recovery from their insurers in an action for breach of good faith; and we therefore modify the bankruptcy court's order to permit the Homsys to bring such an action, although we express no view as to whether Texas law recognizes that cause of action under these circumstances. As an adjunct of that modification, we also declare that the bankruptcy court's injunction shall not prohibit such a suit by the Homsys against their insurers, and that any applicable statute of limitation has been tolled since the advent of the Homsys' litigation in Vitek's bankruptcy proceedings. SO ORDERED.

---

instances may not appropriately be enjoined permanently).