In re **FIRST CENTRAL FINANCIAL CORP.,** Debtor.

**Martin Ochs, as Chapter 7 Trustee of First Central Financial Corp., Plaintiff,**

v.

**Sam Lipson, Great American Insurance Companies, Solomon, Zauderer, Ellenhorn, Frischer & Sharp, Martin J. Simon, Saul Erdman, Herbert V. Friedman, Harvey Mass, Joseph P. Ciorciari, Ralph J. Drabkin, Joan M. Locascio, Andrew W. Attivissimo, Harvey S. Jacobs, Louis V. Siracusano, Seymor D. Uslan, Joel I. Dollinger, Allan R. Goodman, Raymond Brancaccio and Louis Gottlieb, Defendants.**

Bankruptcy No. 198–12848–353.

Adversary No. 199–1281–353.

United States Bankruptcy Court, E.D. New York.

Sept. 3, 1999.

---

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■

Whitman Breed Abbott & Morgan, LLP by Norman N. Kinel, Hollace Cohen, Melissa Zelen Neier, New York City, for Chapter 7 Trustee.

Martin Ochs, Ochs & Goldberg, Chapter 7 Trustee, New York City.

Solomon, Zauderer, Ellenhorn, Frischer & Sharp by Harry Frischer, Emily Stern, New York City, for defendant Officers and Directors.

Peterson & Ross by Ivan J. Dolowich, John Collen (on brief), New York City, for Great American Insurance Companies.

Law Offices of J. James Carriero, by J. James Carriero, East Elmhurst, NY, for Sam Lipson.

## DECISION ON COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

JEROME FELLER, Bankruptcy Judge.

## I. INTRODUCTION

On June 17, 1999, Martin P. Ochs, the Chapter 7 trustee ("Trustee") instituted the above-captioned adversary proceeding seeking declarative and/or injunctive relief to proscribe any potential distribution of proceeds from a directors' and officers' ("D & O") insurance policy, purchased by First Central Financial Corporation, the corporate debtor herein ("Debtor").

Subsequently, on June 18, 1999, a chambers conference was held to consider the Trustee's application for an Order to Show Cause to schedule a hearing on his application for a preliminary injunction and request for a temporary restraining order ("TRO"). At that conference, the Court signed the Order to Show Cause, with the parties consenting to the TRO holding all matters in abeyance pending the hearing. In addition to their extensive papers in support or opposition, the parties also presented lengthy oral argument at the hearing which was conducted on June 30, 1999. They again agreed to an extension of the TRO, until an adjourned hearing date of August 5, 1999, which was scheduled in an effort to afford the parties time to narrow the issues and perhaps reach settlement. Little of note occurred during the interim period or at the subsequent hearing. The parties agreed, however, both to submit the matter to the Court for decision[1] and to extend the TRO consensually until resolution.

The Trustee's main argument is that the Debtor's D & O policy ("Policy") is property of the estate. He reasons that the commencement or continuation of any action which might result in claims to Policy proceeds is subject to the automatic stay arising pursuant to 11 U.S.C. § 362(a)(3).[2] He also asserts that a certain shareholders' lawsuit against the Debtor's officers and directors ("Officers and Directors"), styled *Lipson v. Simon,* No. 98–CV–4573 (E.D.N.Y. July 6, 1998) ("Lipson Action"), is actually an action against the Debtor and is stayed pursuant to 11 U.S.C. § 362(a)(1).[3] Alternatively, the Trustee

---

1. On its face, the parties agreed that the motion for a *preliminary injunction should* be submitted to the Court for resolution. However, the parties' briefs and oral argument addressed all relief sought and every issue raised in the Trustee's complaint. Because this Decision addresses all these matters, no issues remain unresolved. The Decision, therefore, constitutes the Court's disposition of the Trustee's adversary proceeding.

2. Section 362(a)(3) provides that a bankruptcy petition operates as a stay against "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."

3. Section 362(a)(1) provides that a bankruptcy petition operates as a stay against "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor . . . ."

seeks to enjoin any action that could lead to non-Trustee recovery of Policy proceeds pursuant to 11 U.S.C. § 105(a).[4]

This Court recognizes that although a debtor's insurance policy is indeed property of the estate, proceeds payable under that policy are not necessarily estate assets. For the reasons that follow, we hold that the proceeds here in question are not estate property, and hence not subject to the automatic stay. In addition, the Court declines the Trustee's invitation to characterize the Lipson Action as an action against the Debtor. As such, that lawsuit is similarly unaffected by the automatic stay. Finally, there has not been a sufficient showing to justify injunctive relief, therefore we decline to grant the Trustee's request for injunctive relief.

This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052.

## II. BACKGROUND

The Debtor is the holding company for First Central Insurance Company ("FCIC"), a wholly-owned subsidiary, which is presently being liquidating by the New York State Insurance Department under allegations of mismanagement and fraud.[5] FCIC's failure quickly led to the financial collapse of the Debtor. On March 5, 1998, First Central Financial Corp. initiated a Chapter 11 bankruptcy case which was converted soon thereafter to Chapter 7, by order dated April 30, 1998.

After the petition was filed, the Lipson Action was commenced on July 6, 1998. It is a putative class action lawsuit bringing direct shareholder claims against the Officers and Directors for damages under § 10(b) and § 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78(j) and 78t(a), and a state law claim of common law fraud. The Trustee has also sued the Officers and Directors. That lawsuit was commenced as an adversary proceeding in this Court on May 4, 1999, and seeks redress for, *inter alia*, alleged mismanagement and corporate waste.[6]

At the vortex of the instant adversary proceeding lies the D & O Policy. Purchased in late 1997 by the Debtor, the Policy is an executive protection insurance policy entitled "Directors' and Officers' Liability Insurance Policy Including Company Reimbursement" which was issued by the Great American Insurance Companies. D & O insurance is commonly obtained to afford officers and directors protection from adverse claims, and is often included in executive benefit packages as an incentive for employment.

In general terms, the typical D & O policy contains two insuring clauses. The first clause provides liability coverage directly to the officers and directors of a corporation for claims asserted against them for wrongful acts, errors, omissions, or breaches of duty. Frequently, legal expenses are included in this coverage, with defense costs often paid on an ongoing basis.

The second insuring clause provides indirect coverage to the corporation for reimbursement of any monies expended to indemnify its officers and directors either by operation of state law or under the

---

4. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

5. After conducting an audit and investigation which lasted over one year, the New York State Insurance Department ("NYSID") reported that as of December 31, 1996, FCIC "was insolvent in the amount of $3,606,211, its capital was impaired in the amount of $5,606,211, and its required minimum surplus to policyholders was impaired in the amount of $4,806,211." Moreover, the NYSID concluded that FCIC had filed fraudulent financial statements for the years 1993 through 1996, and referred the matter to its Fraud Bureau for review. FCIC is now being liquidated under the aegis of the New York State Superintendent of Insurance.

6. *Ochs v. Simon*, No. 199-1281-353 (Bankr. E.D.N.Y. filed May 4, 1999).

corporate bylaws.[7] Characteristically, these policies often provide a fixed amount of monies available for aggregate coverage, i.e. a cap, under both the reimbursement and liability sections. In other words, payment under the policy is normally provided on a first-come, first-served basis and each such payment reduces the total amount of coverage available to pay claims.

The Policy here fits this basic pattern. It provides liability coverage to the Debtor's Officers and Directors for loss when the Debtor does not or is not permitted to provide indemnification. Coupled with the reimbursement insurance provided to the Debtor, total monetary coverage is subject to a ceiling of $2 million for any and all claims asserted. The coverage period under the Policy was in effect from September 24, 1997 until December 24, 1998. A one year "discovery period", which is set to expire on December 24, 1999, is also provided in the Policy. This discovery period is fairly common in D & O policies, and allows claims to be made during the discovery window for wrongful acts which took place during the coverage period.

This Policy contains one slight twist from the straight-forward format of most D & O insurance contracts. An endorsement, or rider to the Policy, provides so-called "entity coverage" to the Debtor, with a limited sphere of liability protection in the event the corporate entity is sued for violations of securities laws.[8]

Because the Policy provides $2 million in liability protection, the Lipson Action and the Trustee's mismanagement suit may result in competing, insurable claims. In the context of the $2 million ceiling on coverage, it is important to be mindful that the Officers and Directors have an interest in the Policy for coverage of defense costs as well as basic liability protection.

Recognizing the potential race for insurance proceeds between these competing claims, including the imminent draw down of defense costs by the Officers and Di-

7. In the present context, the corporate bylaws of the Debtor includes an indemnification obligation for the benefit of directors and officers. Specifically, Article XII of the bylaws provides:

To the full extent permitted by law, the company shall indemnify any person made or threatened to be made a party to an action or proceeding, whether civil or criminal (including an action by or in the right of or otherwise involving any other company, corporation, partnership or entity of any type or kind, domestic or foreign, which any director or officer of the company served in any capacity at the request of the Corporation), by reason of the fact that he, his testator or intestate, is or was a director or officer of the company, or served such other company, corporation, partnership or entity in any capacity as aforesaid, against judgments, fines, amounts paid in settlement and reasonable expenses, including attorneys' fees actually and necessarily incurred in connection with the defense or as a result of such action or proceeding, or any appeal therein. Nothing contained in this Article XII shall be deemed to limit or in any way effect [sic] any rights to indemnification to which company personnel other than directors and officers may be entitled by contract or otherwise under law.

8. The direct liability coverage for securities claims was furnished by Endorsement 16, entitled "Addition to Section VIII: General Conditions." Among other things, Endorsement 16 provides an insuring agreement

[w]ith the Company that if, during the Policy Period or the Discovery Period, any Securities Claim is first made against the Company for a Wrongful Act the insurer will pay on behalf of the Company all Loss which the Company is legally obligated to pay.

Moreover, the term "Securities Claim" is defined in Endorsement 16 as

[a]ny Claim which in whole or in part alleges any violation of the Securities Act of 1933, the Securities Exchange Act of 1934, rules or regulations of the Securities and Exchange Commission under either or both acts, the securities laws of any state, or any foreign jurisdiction, and which alleges a Wrongful Act in connection with the claimant's purchase or sale of, or the offer to purchase or sell to the claimant, any securities of the Company, whether on the open market or arising from a public offering of securities by the Company.

rectors,[9] the Trustee initiated the instant action, on June 17, 1999, for declaratory and/or injunctive relief which seeks various forms of relief, including:

 (i) a declaration that the Policy proceeds are property of the estate, thereby implicating and imposing the automatic stay upon any third party action that:

 (a) seeks recovery of any insurance proceeds under the Policy, including claims for defense costs by the Officers and Directors, pursuant to § 362(a)(3); and/or

 (b) may lead to claims covered in whole or in part by the Policy, including lawsuits against the Officers and Directors, pursuant to § 362(a)(1); or in the alternative

 (ii) an injunction staying the commencement or continuance of any third party action that seeks recovery of Policy proceeds or any action against the Officers and Directors which may lead to claims against the Policy, pursuant to § 105(a).

The thrust of this adversary proceeding is the Trustee's efforts to insulate Policy proceeds from distribution to any outside interest, primarily the Plaintiffs in the Lipson Action and the Officers and Directors. The Trustee would thus have first crack at the D & O Policy proceeds. Any other efforts to recover proceeds, if monies remain, must await the satisfaction of insurable claims that may arise from the Trustee's mismanagement suit against the Officers and Directors. In essence, the Trustee proposes that all non-Trustee claims to Policy proceeds, including the Officers' and Directors' claims for ongoing litigation expenses in both the Lipson Action and the Trustee's mismanagement suit, are to be held in abeyance.

## III. DISCUSSION

It is not surprising, in corporate financial debacles similar to the one suffered by this Debtor, to find both private lawsuits and trustee initiated adversary proceedings charging officers and directors with various misdeeds including fraud, mismanagement, and waste. Assuming that the Officers and Directors are liable, and further that their conduct is insurable, it is just as unsurprising to find both the Trustee and the Lipson Action Plaintiffs seeking to ensure what is frequently the most facile way to collect on a potential money judgment—a recovery from an insurance policy. Any ensuing competition for a limited pool of insurance proceeds is precisely what the Trustee attempts to circumvent via the instant adversary proceeding, which seeks relief pursuant to 11 U.S.C. §§ 362(a)(1), 362(a)(3), and 105(a).[10] We discuss each *in seriatim.*

## A. Are Proceeds from the D & O Insurance Policy "Property of the Estate" Subject to the Automatic Stay of § 362(a)(3)?

■ Because corporations pay for and own insurance policies, courts considering

---

**9.** To date, the Officers and Directors have not sought an advance of defense costs under the Policy. Those expenses are subject to a deductible, which has nearly been met.

**10.** In the Trustee's Reply Memorandum of Law in Further Support of Application for Preliminary Injunction, filed June 29, 1999, the Trustee added that allowing the Lipson Action to proceed would contravene 11 U.S.C. § 510(b). Defendants in this adversary proceeding were not provided sufficient time to file responsive papers prior to the hearing conducted for oral argument on June 30, 1999. Other than brief discussion between the Court and counsel for the Trustee at the June 30 hearing, the parties have been silent on this point.

Regardless, the Trustee asserted that success by the Plaintiffs in the Lipson Action would impermissibly allow securities holders to recover ahead of creditors. Although § 510(b) requires that claims of shareholders be subordinated to general unsecured claims, that section necessarily implicates only distribution of estate assets in satisfaction of claims against a debtor. Given the fact that the Lipson Action is personal and non-derivative, combined with this Court's ruling that the Policy proceeds are not estate property, the Lipson Action is not a suit against the Debtor, and does not involve potential recovery of estate assets. Accordingly, § 510(b) is inapplicable to this adversary proceeding.

the question have concluded that the policies are property of the estate pursuant to 11 U.S.C. § 541(a)(1). *See, e.g., A.H. Robins Co. v. Piccinin,* 788 F.2d 994, 1001 (4th Cir.), *cert. denied,* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986) ("Under the weight of authority, insurance contracts have been said to be embraced in this statutory definition of 'property.' "). This makes sense given the fact that the filing of a bankruptcy petition creates an estate which includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541(a)(1). In fact, the scope of property of the estate is to be interpreted very broadly. *United States v. Whiting Pools, Inc.,* 462 U.S. 198, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983).

■ Hence, when a corporation becomes the subject of a bankruptcy case, its insurance policies become property of the bankruptcy estate. *See, e.g., A.H. Robins Co.,* 788 F.2d at 1001; *In re Davis,* 730 F.2d 176, 184 (5th Cir.1984); *Johns–Manville Corp. v. Asbestos Litig. Group (In re Johns–Manville Corp.),* 40 B.R. 219, 230–31 (S.D.N.Y.1984). Generally, the estate's property interest in the proceeds of a typical liability policy is an unstated given. In most situations this is entirely understandable, since the debtor is also the beneficiary of the liability insurance coverage.

■ While a majority of courts consider a D & O policy estate property, *see, e.g., Minoco Group of Cos., Ltd. v. First State Underwriters Agency of New England Reinsurance Corp. (In re Minoco Group of Cos., Ltd.),* 799 F.2d 517, 519 (9th Cir.1986) (declaring a D & O policy property of the estate thereby disallowing insurance company's attempt to cancel the policy), there is an increasing view that a distinction should be drawn when considering treatment of proceeds arising under such policies. *See, e.g., Houston v. Edgeworth (In re Edgeworth),* 993 F.2d 51, 56 (5th Cir. 1993) (stating that "when the debtor has no legally cognizable claim to the insurance proceeds, those proceeds are not

property of the estate"); *In re Daisy Sys. Sec. Litig.,* 132 B.R. 752, 755 (N.D.Cal. 1991) (holding that proceeds of D & O policies were not assets of the estate because the directors and officers were the primary beneficiaries of the policies); *Duval v. Gleason,* No. C–90–0242–DLJ, 1990 WL 261364, at *5 (N.D.Cal., Oct. 19, 1990) (ruling that although a D & O policy was property of the estate, the court was "not persuaded that the insurance policy proceeds ... necessarily constitute 'property' of the debtor policy-owner within the meaning of § 541(a)(1) such that the present proceedings [against non-debtor co-defendants] must be stayed").

■ D & O policies are obtained for the protection of individual directors and officers. Indemnification coverage does not change this fundamental purpose. There is an important distinction between the individual liability and the reimbursement portions of a D & O policy. The liability portion of the policy provides coverage directly to officers and directors, insuring the individuals from personal loss for claims that are not indemnified by the corporation. Unlike an ordinary liability insurance policy, in which a corporate purchaser obtains primary protection from lawsuits, a corporation does not enjoy direct coverage under a D & O policy. It is insured indirectly for its indemnification obligations. In essence and at its core, a D & O policy remains a safeguard of officer and director interests and not a vehicle for corporate protection.

The Fifth Circuit recognized the unique workings of D & O policies in the seminal case of *Louisiana World Exposition, Inc. v. Federal Ins. Co. (In re Louisiana World Exposition, Inc.),* 832 F.2d 1391 (5th Cir. 1987). Convinced that D & O insurance arrangements differ substantially from the typical liability insurance policy, the court drew a distinction between a corporation's mere ownership of the policy from its interest in the policy proceeds. It declared that liability proceeds of a D & O policy

are not assets of the estate and belong instead to the directors and officers as beneficiaries. *See id.* at 1401.

In *Louisiana World,* a creditors' committee, on behalf of the corporate debtor, sued the officers and directors for malfeasance and mismanagement. While the suit was pending, the insurer regularly paid claims for the legal expenses of the officers and directors. Concerned that there would be insufficient funds under the policy to cover both the legal expenses and any future damages awarded, the committee brought a second suit seeking to enforce the automatic stay to prevent further payment of the defense costs. The committee argued that the policy was property of the debtor's estate and therefore any requests for legal expenses were subject to the automatic stay. *See id.* at 1394.

Differentiating liability coverage under D & O policies from other forms of liability insurance, where the debtor is both the named insured and a direct beneficiary of the policy, the *Louisiana World* court held that D & O policies more closely resembled situations in which the owner of an insurance policy assigns the proceeds to a third party. Those proceeds belong to the assignee or beneficiary and not to the policy owner's bankruptcy estate. *See id.* at 1401 (citing *In re Ivory,* 32 B.R. 788, 793–94 (Bankr.D.Or.1983); *Clarke and Cohen v. Family & Indus. Medical Facilities, Inc. (In re Family & Indus. Medical Facilities, Inc.),* 25 B.R. 443, 450–51 (Bankr. E.D.Pa.1982); *In re Moskowitz,* 14 B.R. 677, 680–81 (Bankr.S.D.N.Y.1981)).

However, *Louisiana World* observed that when policies, including D & O policies, provide direct liability coverage to the debtor, "the estate owns not only the policies, but also the proceeds designated to cover corporate losses or liability." 832 F.2d at 1400. The Trustee contends that the entity coverage included in the Policy requires a determination that the proceeds be categorized as property of the estate. Considering the totality of the factual setting, we do not agree. "[I]nsurance *poli-*

*cies* are property of the estate ..., but the question of whether the *proceeds* are property of the estate must be analyzed in light of the facts of each case." *In re Sfuzzi, Inc.,* 191 B.R. 664, 668 (Bankr.N.D.Tex. 1996) (emphasis in original).

The mere appendage of entity coverage to this Policy by way of a rider, providing the Debtor with protection from securities claims, does not provide sufficient predicate, *per se,* to metamorphose the proceeds into estate property. It may well be that proceeds of certain D & O insurance policies, which provide direct entity coverage to a corporate debtor, can be considered property of the estate. *See, e.g., Homsy v. Floyd (In re Vitek, Inc.),* 51 F.3d 530, 535 (5th Cir.1995) (commenting that the court has "not yet grappled with how to treat the proceeds of [a D & O policy] when the policy-owning debtor is but one of two or more coinsureds or additional named insureds"). Perhaps, this determination would be appropriate when many and/or large entity coverage claims against the debtor threaten to become a "free-for-all" that might exhaust the insurance proceeds and thereby jeopardize estate assets over and above the limits of the policy. *See In re Edgeworth,* 993 F.2d at 56 n. 21. In such situations, the debtor's entity coverage competes for proceeds with the officer and director liability portion of the insurance policy. For every dollar paid out to the officers and directors there is one less dollar of coverage protecting the debtor's estate.

In this case, the estate is in no need of protection. During the eighteen months this bankruptcy case has been pending, there have been no claims filed against the Debtor which would implicate the narrow scope of the Policy's entity coverage. Indeed, no one has stepped forward to express any interest in suing the Debtor for a violation of securities laws. Nor has the Trustee intimated that any action against the Debtor is imminent or likely. We are skeptical that any individual or entity will ever emerge to assert such claims prior to

the expiration of the discovery period in December, 1999.[11] If entity coverage is hypothetical and fails to provide some palpable benefit to the estate, it cannot be used by a trustee to lever himself into a position of first entitlement to policy proceeds. *See In re Reliance Acceptance Group, Inc.,* 235 B.R. 548, 561 (D.Del.1999) (concluding that the debtors "have been unable to identify a legal principle that stands for the proposition that the Estate's claims for relief should take precedence over the Shareholders' [non-derivative] claims"); *Official Unsecured Creditors' Committee v. Bowen (In re Phar–Mor, Inc. Sec. Litig.),* 164 B.R. 903, 905 (W.D.Pa.1994) (stating that there is "no legal authority which would elevate the claims and the right to redress of the Debtor over the separate and distinct [non-derivative claims of the shareholder] Plaintiffs").

### B. Is the Lipson Action a Proceeding Against the Debtor Subject to the Automatic Stay of § 362(a)(1)?

 In general, only a debtor is included within the protective umbrella afforded by the automatic stay that arises pursuant to § 362(a)(1). Third-party defendants or co-defendants are typically not provided such protection.[12] Therefore, lawsuits instituted against officers and directors of a corporate debtor are usually not stayed. *See Bedel v. Thompson,* 103 F.R.D. 78, 81–83 (S.D.Ohio 1984) (holding that the automatic stay was inapplicable to an action for violations of securities laws instituted against former directors because the debtor was not deemed an indispens-

able party); *see also Credit Alliance Corp. v. Williams,* 851 F.2d 119, 121 (4th Cir. 1988) (stating that the plain language of § 362(a) does not apply to non-debtors and will not be applied absent "unusual circumstances"); *In re Crazy Eddie Sec. Litig.,* 104 B.R. 582, 583 (E.D.N.Y.1989) (ruling that "stays pursuant to § 362(a) are limited to debtors and 'do not encompass non-bankrupt co-defendants' ") (quoting *Teachers Ins. & Annuity Ass'n of Am. v. Butler,* 803 F.2d 61, 65 (2d Cir.1986)); *Cornick v. Hi Grade Cleaners, Inc.,* 595 F.Supp. 718, 720–21 (N.D.Ill.1984) (holding that the automatic stay does not apply to claims against the debtor's non-bankrupt codefendants).

 Even when an action is pending as of the petition date against a corporate debtor which is a codefendant with its officers and directors, the lawsuit is typically stayed only as to the debtor. *See Wedgeworth v. Fibreboard Corp.,* 706 F.2d 541, 544 (5th Cir.1983) (ruling that a debtor may be severed from an action, which may then be continued against the other named defendants). Basically, "where a non-debtor codefendant may be held independently liable of the debtor, then there is no compelling basis by which a court must extend the automatic stay provisions of § 362 to the non-debtor codefendants." *Duval v. Gleason,* 1990 WL 261364, at *4.

 The Fourth Circuit, in the *A.H. Robins* case, stated that " 'where the debtor and another are joint tort feasors or where the nondebtor's liability rests upon his own breach of a duty,' " an automatic stay " 'would clearly not extend to such

---

11. The Lipson Action Plaintiffs assert that even if a securities suit triggering entity coverage were initiated, it is unclear that such a lawsuit can be successful. The ability to initiate a securities claim against the Debtor may have become time barred by the "one year from discovery" limitations period applicable to such claims. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Although The Trustee counters that state securities violations are also covered by the Policy, and that state law time limits may differ from

the one year federal statute, any available state law causes of action alleging a securities law violation in connection with the purchase or sale of a covered security may have been preempted. *See* Securities Litigation Uniform Standards Act of 1998, Pub.L. 105–353, 112 Stat. 3230 (1998) (codified at 15 U.S.C. § 78bb(f)(1)).

12. One important exception is, of course, the co-debtor stay provided by 11 U.S.C. § 1301.

nondebtor.' " 788 F.2d at 999 (quoting *Plessey Precision Metals, Inc. v. Metal Ctr., Inc. (In re Metal Ctr., Inc.)*, 31 B.R. 458, 462 (Bankr.D.Conn.1983)). Actions against non-debtors associated with the debtor may be stayed under § 362(a)(1) only when "unusual circumstances" are present. *Id.* The court explained that

> [t]his "unusual situation," it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor.

*Id.; accord F.T.L., Inc. v. Crestar Bank (In re F.T.L., Inc.)*, 152 B.R. 61, 63 (Bankr.E.D.Va.1993); *General Dynamics Corp. v. Veliotis (In re Veliotis)*, 79 B.R. 846, 848 (Bankr.E.D.Mo.1987).

According to the Trustee, the Lipson Action, and any other potential lawsuits against the Officers and Directors, are essentially suits against the Debtor. They may give rise to indemnification claims against the Debtor and findings made in such suits may be binding on the Debtor by way of collateral estoppel. Notwithstanding these contentions, "unusual circumstances" are just non-existent.

The Trustee cites *A.H. Robins*, 788 F.2d at 999–1001, *Gillman v. Continental Airlines (In re Continental Airlines)*, 177 B.R. 475, 481 (D.Del.1993), and *Johns–Manville Corp. v. Asbestos Litig. Group (In re Johns–Manville Corp.)*, 26 B.R. 420, 428–29 (Bankr.S.D.N.Y.1983), *aff'd*, 40 B.R. 219 (S.D.N.Y.1984) for the proposition that § 362(a)(1) exists precisely to prevent lawsuits from proceeding when they might lead to indemnification demands upon a debtor. The reliance is misguided.

Those cases presented unique circumstances not found here. Numerous lawsuits were pending against the Chapter 11 debtors' officers and directors. Permitting the maintenance of those suits would have, in all likelihood, resulted in a massive depletion of estate assets and inhibited key personnel from the important business of getting the corporate debtor back on its feet. *See, e.g., A.H. Robins*, 788 F.2d at 996 (commenting on the "avalanche of actions" filed nationally and internationally, which compelled extension of the stay in order to allow the reorganization to go forward).

■ Clearly, the underlying purpose behind embracing non-debtor officers and directors within the stay provided by § 362(a)(1) is to suspend actions that pose a serious threat to a corporate debtor's reorganization efforts. *See In re United Health Care Org.*, 210 B.R. 228, 234 (S.D.N.Y.1997) (staying creditor suits against non-debtors where those actions would harm the reorganization effort); *In re Continental Airlines*, 177 B.R. at 479 (staying litigation that would adversely affect the debtor's "ability to pursue a successful plan of reorganization under Chapter 11"). In *Gray v. Hirsch*, 230 B.R. 239, 243 (S.D.N.Y.1999), the court refused to stay a shareholders action brought against the corporate debtor's principal for alleged violations of securities laws. The court explained that extending the stay was inapplicable in a Chapter 7 case because

> a debtor's stay may extend to a non-debtor only when necessary to protect the debtor's reorganization. The threatened harm may be to needed debtor funds (e.g., when non-debtors are entitled to indemnification) or personnel (e.g., when debtors need the services of non-debtors facing crushing litigation). The question is whether the action against the non-debtor is sufficiently likely to have a "material effect upon ... reorganization effort[s]" that debtor protection requires an exception to the usual limited scope of the stay.

*Id.* at 243 (citing *CAE Indus. Ltd. v. Aerospace Holdings Co.*, 116 B.R. 31, 34 (S.D.N.Y.1990)).

■ Although we are aware that the Officers and Directors possess a right to

indemnification for loss not covered under the Policy, even with the "right to indemnification ..., the magnitude of the harm to debtor if no stay is in force does not approach the scope of the potential injuries besetting the debtors in Robins and Johns–Manville." *All Seasons Resorts, Inc. v. Milner (In re All Seasons)*, 79 B.R. 901, 904 (Bankr.C.D.Cal.1987).

Here, mass litigation is non-existent, there is no reorganization effort which would require the participation of the Officers and Directors, and no discernible harm can be ascribed to the Debtor if the Officers and Directors ultimately file claims for indemnification in this Chapter 7 case. The Trustee is arguing semantics. He asserts that the Officers' and Directors' indemnification demands may eventually be filed in this case, but we are mystified as to how this constitutes harm to the Debtor.

Further, we are unconvinced that potential indemnification demands would damage the estate. Although claims for indemnification filed in this Chapter 7 liquidation might lessen the overall percentage of a *pro rata* distribution to creditors, such distributive adjustment does not damage the estate. *Cf. Louisiana World*, 832 F.2d at 1400 ("There is not the potential for increasing the estate's exposure by payment of liability [insurance] proceeds due."). A potential for additional claims in this case, without more, does not constitute "unusual circumstances" which would necessitate imposition of the automatic stay upon the Lipson Action.

The Trustee's collateral estoppel argument is equally unconvincing. Unlike the Trustee's mismanagement suit, the Lipson Action is not derivative in nature, it is a direct shareholders' suit. While some of the underlying facts in the Lipson Action may be similar to those involved in the Trustee's mismanagement suit, the two lawsuits raise separate and discrete causes of action for breaches of different duties. *See In re Reliance Acceptance Group, Inc.*, 235 B.R. at 555. We fail to understand how the Trustee, in his mismanagement lawsuit, can be bound by findings in the Lipson Action, when that suit forwards different claims, alleges different duties, and requires a presentation of different evidence.

Moreover, the Lipson Action forwards direct, personal claims for relief that do not belong to the Trustee; he is not a necessary party to that lawsuit. The case of *In re Reliance Acceptance Group*, presented a similar factual setting with a similar collateral estoppel argument employed by a debtor-in-possession ("DIP"). *See* 235 B.R. at 558. In articulating the standards for applying issue preclusion, the court relied on Section 27 of Restatement of the Law Second, Judgments 2d, which reads:

> When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.

The court rejected the DIP's claim that the estate would be bound by findings reached in a separate shareholders' direct action, since the DIP was not a party to that litigation. We have been given no reason to disagree with that observation within the context of this adversary proceeding.

### C. Do the Circumstances Sufficiently Support the Grant of an Injunction Pursuant to § 105(a)?

Injunctions are extraordinary remedies. Therefore, more than perceived necessity is required to demonstrate their appropriateness. In this Circuit, it is well established that the party seeking an injunction has the burden

> to show not only that it is likely to suffer irreparable injury if relief is denied but also that there is either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits

to make them a fair ground for litigation, with a balance of hardships tipping decidedly in the plaintiff's favor.

*Procter & Gamble Co. v. Chesebrough–Pond's Inc.*, 747 F.2d 114, 118 (2d Cir. 1984); *accord Chemical Bank v. Haseotes*, 13 F.3d 569, 572 (2d Cir.1994); *Coca–Cola Co. v. Tropicana Prods., Inc.*, 690 F.2d 312, 314–15 (2d Cir.1982); *KMW Int'l v. Chase Manhattan Bank, N.A.*, 606 F.2d 10, 14 (2d Cir.1979).

■ The Trustee asserts that even if the automatic stay is not applicable, the issuance of an injunction, pursuant to 11 U.S.C. § 105(a), is necessary and appropriate in this case to carry out the provisions of Title 11. Permitting the Lipson Action to proceed would hamper his ability to marshall and preserve a valuable asset of the estate. Any claimants, he argues, who recover insurance proceeds outside of the bankruptcy proceedings would impermissibly receive dollar-for-dollar on their claim, rather than a *pro rata* share with other creditors. According to the Trustee, absent an injunction, the estate will be irreparably harmed because a significant asset of the estate will be diminished. These arguments miss the mark.

■ On the main, the Trustee's assertions echo his previous contentions that the Policy proceeds are indeed estate assets. But as discussed above, this Court has determined otherwise. Furthermore, the Trustee's mismanagement action seeks an award of money damages. He has never, however, offered evidence that the Officers and Directors will be unable to satisfy a money judgment. As a general rule, of course, a party may not obtain the equitable relief of an injunction when there is an available remedy at law. *See Haseotes*, 13 F.3d at 573; *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 974–75 (2d Cir.1989); *Green v. Drexler (In re Feit & Drexler, Inc.)*, 760 F.2d 406, 416 (2d Cir.1985); *Sperry Int'l Trade, Inc. v. Government of Israel*, 670 F.2d 8, 12 (2d Cir.1982).

The Trustee has made little effort to establish that the estate will suffer injury warranting equitable relief. On the other hand, any injunction that strips coverage from the Officers and Directors under the Policy, or restrains the Lipson Action Plaintiffs from pursuing their lawsuit, imposes an obvious hardship. It seems beyond cavil that balancing the Trustee's unsupported perception that the estate will be injured against the demonstrable harm that an injunction will inflict, weighs heavily in favor of the individuals. The Trustee's request for an injunction is therefore denied.

## IV. CONCLUSION

When determining whether D & O insurance policies are property of the estate, courts must distinguish between an insurance policy, which is unquestionably an estate asset, and its proceeds, which requires a fact specific analysis. Although debtor liability policies have been shielded from third party suits that threaten to deplete estate assets, the Trustee has not pointed to a case, nor are we aware of one, in which a court has protected D & O policy proceeds so as to facilitate a prioritization in favor of a trustee or debtor-in-possession to such funds. The appendage of an inchoate entity coverage endorsement, without more, is not license for a trustee to obtain first crack at proceeds of a D & O policy. Indeed, the Trustee has a duty, pursuant to 11 U.S.C. § 704(1), to marshall assets of the estate. Nonetheless, that duty does not freely translate into a superseding right to recover insurance proceeds, which are not property of the estate, before all others.

We might reach a different result given different facts. The Policy was obtained primarily for the protection of the Officers and Directors. This Court is unwilling to divest the Officers and Directors of the liability protection they bargained for, including ongoing draw down of legal fees. The Lipson Action, which forwards personal causes of action possessed by sharehold-

ers rather than any derivative claims, should not be held hostage to the Trustee's mismanagement suit.

Accordingly, for all of the above-stated reasons, the Trustees action for declaratory and/or injunctive relief is hereby dismissed.

***AN ORDER CONSISTENT WITH THIS DECISION IS BEING ENTERED SIMULTANEOUSLY HEREWITH***