**In re ADELPHIA COMMUNICATIONS CORP., et al., Debtors.**

**In re Adelphia Communications Corp., et al., Plaintiff–Debtors,**

**v.**

**Associated Electric & Gas Insurance Services, Ltd., Federal Insurance Company, and Greenwich Insurance Company, Defendants.**

**In re Adelphia Business Solutions, Inc., et al., Debtors.**

**Bankruptcy Nos. 02–41729 (REG), 02–11389(REG).**

**Adversary No. 02–03282.**

United States Bankruptcy Court, S.D. New York.

Nov. 15, 2002.

Boies, Schiller & Flexner, LLP, by Philip C. Korologos, Esq., Armonk, NY, for the Debtors in Adelphia Communications Corp. Case.

Kasowitz, Benson, Torres & Friedman, LLP, by Daniel N. Zinman, Esq., New

York City, for the Creditors' Committee in Adelphia Communications Corp. Case.

Sidley, Austin, Brown & Wood, LLP, by Norman N. Kinel, Esq., New York City, for the Equity Committee in Adelphia Communications Corp. Case.

Weil, Gotshal & Manges, LLP, by Judy G.Z. Liu, Esq., Miranda S. Schiller, Esq., New York City, for Debtors in Adelphia Business Solutions Case.

Kramer, Levin, Naftalis & Frankel, LLP, by Amy D. Caton, Esq., New York, City, for the Creditors' Committee in Adelphia Business Solutions Case.

Dilworth, Paxson, LLP, by J. Bradford McIlvain, Esq., Martin J. Weis, Esq., Sam D. Anderson, Esq., Philadelphia, PA, for John, Timothy, Michael and James Rigas.

Harrington & Mahoney, by Mark J. Mahoney, Esq., Buffalo, NY, for Michael Mulcahey.

Morrison & Foerster, LLP, by Jonathan P. Bach, Esq., New York City, for James R. Brown.

Law Office of Martin J. Auerbach, by Martin J. Auerbach, Esq., New York City, for Peter Venetis.

Brobeck, Phleger & Harrison, LLP, by Francis S. Chlapowski, Esq., New York City, for Independent Directors Dennis P. Coyle, Leslie J. Gelber and Erland E. Kailbourne.

Dewey, Pegno & Kramarsky, LLP, by Thomas E.L. Dewey, Esq., New York City, for Independent Director Pete J. Metros.

Arter & Hadden, LLP, by Dan A. Bailey, Esq., Columbus, OH, Scarcella, Rosen & Slome, LLP, by Louis A. Scarcella, Esq., Garden City, NY, for Associated Electric & Gas Insurance Services Limited.

Hogan & Hartson, LLP, by David M. Posner, Esq., Peter R. Bisio, Esq., New York City, for Federal Insurance Company.

Ross, Dixon & Bell, LLP, by John R. Gerstein, Esq., Leslie S. Ahari, Esq., Washington, DC, Brauner, Baron, Rosenzweig & Klein, LLP, by Leslie S. Barr, Esq., New York City, for Greenwich Insurance Company.

*Decision on Motions With Respect to D & O Policies*

ROBERT E. GERBER, Bankruptcy Judge.

In the separately administered, but related, chapter 11 cases of Adelphia Communications Corporation ("ACC") and ACC's former subsidiary, Adelphia Business Solutions, Inc. ("ABIZ," which was spun-off from ACC), the Court has before it a total of five motions for relief from the section 362 stay, to enforce the stay and/or to extend the stay, with respect to three Directors & Officers ("D & O") insurance policies that now cover ACC and ABIZ officers and directors (the "D & O Policies"). Underlying the controversy are questions as to the extent to which the D & O Policies will cover the costs of defense and any possible judgments in the many civil lawsuits (now more than 40) that have been commenced against John Rigas (ACC's major shareholder and former chief executive officer), members of his family, others alleged to have acted with him, and independent directors of ACC[1]—in the light of disputes as to the rescission of those policies, policy exclusions, and conflicting claims as to the proceeds of

---

1. Dennis P. Coyle, Leslie J. Gelber, Erland E. Kailbourne, and Pete J. Metros (collectively, the "Independent Directors").

those policies. Decisions in that regard will also affect the extent to which the D & O Policies are available for any future litigation (none having yet been commenced) against the independent directors of ABIZ.

Specifically, in the first two motions, John Rigas and his sons Timothy, James and Michael Rigas (the "Rigas Family"), two ACC employees who are alleged to have acted with them, James Brown and Michael Mulcahey (the "Former Employees," and together with the Rigas Family, the "Rigas Insureds"),[2] move for relief from the stay, "to the extent necessary," in each of the ACC and ABIZ cases to permit them to make claims against the D & O Policy insurers for their defense costs in connection with the allegations that have been made against them, and to proceed with litigation against the D & O insurers if the D & O insurers continue, as they have done so far, to disclaim liability under their policies.

In the third and fourth motions, Associated Electric & Gas Insurance Company ("AEGIS"), Federal Insurance Co. ("Federal"), and Greenwich Insurance Co. ("Greenwich," and together with AEGIS and Federal, the "Insurers")—the insurers on the D & O Policies' primary and two excess layers—seek relief from the stay, "to the extent necessary," to name ACC and ABIZ as additional defendants in a declaratory judgment action that the Insurers have commenced against the Rigas Insureds, Peter Venetis and the Independent Directors in the United States District Court for the Eastern District of Pennsylvania (the "Declaratory Judgment Action"). The Insurers seek declaratory judgments determining that policy exclusions apply to any defense costs incurred, or judgments suffered, by the Rigas Insureds and Mr. Venetis, and, with respect to entity coverage, ACC; additionally, the two excess carriers (but not AEGIS) seek to rescind the policies for fraud, so as to excuse the excess carriers from coverage for the Independent Directors as well.

In the fifth motion, ACC seeks an order and/or preliminary injunctive relief, in the adversary proceeding that ACC has brought in connection with the foregoing, enforcing the section 362 stay, or, alternatively, extending it under Bankruptcy Code section 105(a), to enjoin the prosecution of the Declaratory Judgment Action.

The motions require a balancing of the needs and concerns of the insureds under D & O policies, who have their own contractual rights under such policies and an expectation that they can look to their D & O policies even when the companies for which they serve go into bankruptcy, and the needs and concerns of debtors and creditors, for whom the policies (and in many cases their proceeds) are property of the estate, and who wish to preserve that property to facilitate their reorganization.

For the reasons that follow, the Court concludes that under the facts of this case, relief from the stay to do any of the desired things is indeed necessary. The Court further concludes that in this relatively rare case where the Court has to take into account, in addition to the usual

2. The Former Employees are not related to members of the Rigas Family, but, like John, Timothy and Michael Rigas, are the subject of criminal proceedings and civil litigation alleging wrongful conduct. Mr. Venetis is John Rigas' son-in-law, but has not been criminally charged; though he did not file papers, he appeared in Court to request the same relief as the Rigas Insureds. The Court refers to the Former Employees as "Rigas Insureds" only as a shorthand means to describe their joinder in some of the pending motions in this Court; needless to say, the Court is not expressing a view as to the extent, if any, to which either should be linked with other Rigas Insureds for any substantive purpose.

factors informing relief from the stay on motions of this character:

(1) criminal charges against Rigas Insureds John, Timothy and Michael Rigas, James Brown and Michael Mulcahey;

(2) a risk that unfettered resort to policy proceeds could exhaust coverage (and hence destroy, for all practical purposes, one or more policies);

(3) in the case of ACC, a significant possibility of a distribution to equity holders, so that so-called "entity coverage," discussed below, may be relevant, even after section 510(b) subordination is taken into account; and

(4) the need to protect ABIZ, which has an asserted 18.5% ownership interest in the D & O Policies, and whose directors and officers, along with ABIZ, have a like interest in the D & O Policies' proceeds,

limitations must be placed on access to the D & O Policies, and particularly litigation with respect to them, at this time. For the reasons set forth below, the Court determines:

Motions (1) and (2): The Rigas Insureds' motions for relief from the stay, in each of the ACC and ABIZ cases, are granted to the extent, but only the extent, of permitting the Rigas Insureds to request, and permitting the Insurers to pay, if the Insurers are agreeable to doing so, up to $300,000 per insured on account of defense costs, without prejudice to requests for further funding with notice and opportunity to be heard; [3] they are otherwise denied, without prejudice to renewal after the conclusion of the now-pending criminal proceedings.[4]

Motions (3) and (4): The Insurers' motions for relief from the stay, in each of the ACC and ABIZ cases, to name ACC and ABIZ as defendants in the

3. The Independent Directors do not concede that their requests for defense costs are subject to the automatic stay (Independent Directors' Memo # 1 ¶¶ 14, 17), but the Court believes such requests are subject to the stay, for the reasons set forth below. The Independent Directors also argue that to the extent the automatic stay applies, it "[s]hould be lifted to allow the Independent Directors to receive insurance proceeds to reimburse defense costs" (*id.*, heading before ¶ 12), and that it "only should be lifted in order to allow the Independent Directors to receive reimbursement of their defense costs...." (*Id.* ¶ 14). The Court believes that under the analysis below, it would follow that relief from the stay is appropriate to permit the Independent Directors to request, and the Insurers consensually to pay, defense costs, at least to the extent that the Court has permitted it with respect to the Rigas Insureds, but the Court notes—as did the Independent Directors themselves (*see* Independent Directors' Memo # 2 ¶ 3)—"that the Independent Directors did not formally move for any relief." The Court assumes that the latter remarks were intended to trump whatever might have been inferred from the first two quoted passages;

while it believes in judicial efficiency, it believes that it would be inappropriate now to grant relief that has not been requested. In the interests of balancing judicial efficiency with opportunity for those with differing views to be heard, the Independent Directors may, if they wish and there are no objections, submit a consent order granting them relief from the stay to the same extent as that now granted to the Rigas Insureds. If their efforts to secure consent are unsuccessful, they may move for relief, and others may oppose it, consistent with the principles set forth in this decision, which will be precedent, but not *res judicata,* in connection with any such motion.

4. Leave to litigate the propriety of the refusal on the part of the Insurers to pay the defense costs of Rigas Insureds is denied at this time. While the Court fully recognizes that the Insurers are likely to refuse to pay upon the request of most, if not all, of the Rigas Insureds, the Court believes that litigation of any matters involving the conduct of the Rigas Insureds is inappropriate during the pendency of the criminal proceedings, upon application of the *"Sonnax"* factors, discussed below.

Declaratory Judgment Action are denied, without prejudice to renewal after the conclusion of the now-pending criminal proceedings; and

(5). ACC's motion for a stay of the Declaratory Judgment Action, under sections 362 and 105(a), is granted, under section 362, without prejudice to reconsideration after the conclusion of the now-pending criminal proceedings.

The following are the Court's findings of fact, conclusions of law, and bases for the exercise of its discretion in connection with these motions.

*Facts*

*Background*

ACC is the former parent company of ABIZ; in January 2002, ABIZ was spun off from ACC in a transaction by which ACC distributed its equity interests in ABIZ to ACC shareholders.[5] Prior to the filing of all of chapter 11 petitions of the various debtors, and prior to the ABIZ spin-off, the D & O policies originally were issued to ACC. As a result of the spin-off, ABIZ paid three separate premiums to the Insurers in exchange for an agreement that ABIZ and its directors and officers would continue to have coverage under the D & O policies that ACC originally had purchased.

*The D & O Policies*

The three D & O Policies, each of which has a policy period of December 31, 2000 though December 31, 2003, are:

(1) a "claims-made" D & O policy issued by AEGIS (the "AEGIS Policy"), which provides a primary layer of coverage in the amount of $25 million;

(2) an excess policy issued by Federal (the "Federal Policy"), which provides excess coverage of up to $15 million in excess of the $25 million in primary coverage provided by the AEGIS Policy; and

(3) a second excess policy issued by Greenwich (the "Greenwich Policy"), which provides coverage in amounts up to $10 million in excess of the $40 million total coverage provided by the AEGIS Policy and the Federal Policy.

Thus, the D & O Policies provide primary and excess coverage in the aggregate of $50 million.

Under the policies,[6] directors and officers are covered for "Ultimate Net Loss" that they are legally obligated to pay, on account of any "Claim" for a "Wrongful Act," as those terms are defined in the policies, subject to policy exclusions. "Ultimate Net Loss" is defined in such a way as to cover the two types of loss that most commonly are covered in policies of this character—defense costs, and actual liability for allegedly wrongful conduct.

Significantly for the analysis that follows, the D & O Policies provide "indemnification coverage," indemnifying the debtors for payments they might make for covered matters to their officers and directors, under corporate charter, by-laws and the like. They also provide so-called "entity coverage," with respect to liability of ACC or ABIZ for violations of the federal securities laws. They do not have what is sometimes referred to as a "priority of payments" endorsement, providing in substance that payments on account of the defense costs of directors and officers

---

**5.** Prior to January 2002, approximately 80% of ABIZ's common stock was beneficially owned by ACC. On January 11, 2002, ACC distributed its equity interest in ABIZ to ACC shareholders.

**6.** This broad-brush description, for ease of understanding, is not intended to be a technical discussion of rights and obligations under the policies; parties' rights with respect to such are reserved.

come ahead of payments for indemnification coverage and/or entity coverage.[7]

It has not been suggested that any of the Debtors has made any payments for which it would be entitled to indemnification coverage, or that any such payments are now contemplated.[8] Nor have any of the Debtors made or committed themselves to payments using their entity coverage. However, ACC, which has enough potential value to warrant the appointment of an Official Committee of Equity Security Holders ("Equity Committee"), may be able to pay its creditors in full or otherwise make distributions to equity, and may ultimately wish to avail itself of such coverage.

Because the D & O Policies are subject to an "aggregate limit," which includes all payments made by the Insurers on behalf of the insureds, each dollar paid out of the D & O Policies for attorneys' fees, settlements, judgments or indemnification on behalf of any insured person or entity leaves one dollar less for other payments under the D & O Policies. That is a matter of concern for ABIZ, which does not now have litigation pending against its officers and directors (other than the Rigas Insureds, who have been sued with respect to their activities at ACC), and which needs D & O coverage on a continu-ing basis to retain its independent directors and to reorganize. ABIZ stated, without contradiction, and the Court accepts, that

> ABIZ's outside directors will not continue to serve on its Board of Directors if ABIZ has no D & O insurance, particularly in the current legal environment with dozens of shareholder actions pending against the former ACC directors. ABIZ has been unable to locate another carrier willing to underwrite a claims made D & O policy insurance policy for ABIZ which provides coverage similar to the AEGIS Policy ... The lack of D & O coverage presents an even greater problem for ABIZ because it has limited financing available with which to indemnify its outside directors if they incur losses from claims related to their actions as ABIZ directors.[9]

ABIZ has brought an adversary proceeding in this Court against ACC for a declaration "carving out," for the benefit of ABIZ and its officers and directors, 18.5% of the total D & O Policies coverage—which is the proportion of the total premium for the D & O Policies that ABIZ paid to secure D & O policy coverage for its people. This Court denied ACC's motion to dismiss that adversary proceeding, and that proceeding is pending.

---

7. *See* Insurers' Exh. A (ACC/ABIZ AEGIS Policy); ACC Equity Committee's Response ¶ 21 & Exh. A (comparing and contrasting the policies issued to ACC and to Enron).

   The AEGIS Policy does have what has been referred to as an "allocation of payment" endorsement, which provides in substance that (1) if a claim is made against both the directors and officers and others (including the Company), or (2) if a clam against the directors and officers includes both covered and non-covered matters, then the directors and officers, the company and the insurer "shall allocate on a fair and reasonable basis any defense costs, settlement, judgment or other loss on account of such claim between covered ultimate net loss attributable to the claim against the directors and officers and non-covered loss." It is possible that this clause could at some point have relevance in these cases, but the matter has not been extensively briefed, and the Court makes no determination as to the construction of the "allocation of payment" endorsement at this time, other than to note that it is different from a "priority of payment" endorsement like the one Enron has.

8. That is not surprising, since in most cases requests for such would be prepetition claims.

9. ABIZ Memo at ¶ 3.

*Criminal and SEC Proceedings*

On July 24, 2002, the United States Department of Justice instituted criminal proceedings against Rigas Insureds John, Timothy and Michael Rigas, James Brown, and Michael Mulcahey. John Rigas, Timothy Rigas and Michael Rigas were arrested in Manhattan.[10] The five individuals were indicted on September 23, 2002; the 24–count indictment includes charges of conspiracy, securities fraud, wire fraud, and bank fraud.

No date for the criminal trial has yet been set, though in response to questions by this Court, counsel for ACC and the Rigas Insureds expressed a joint belief (though the Court did not regard such as formal representations) that it likely would take place sometime after the beginning of 2003, but probably not as early as January. The Court assumes, for the sake of analysis, that the criminal proceedings would not begin before the end of 2002, and might not be concluded, even at the trial level, until the latter part of 2003.

On November 14, 2002, just before the issuance of this decision, Mr. Brown entered a guilty plea, which counsel for ACC argues underscores his lack of entitlement to D & O policy proceeds. That may be true, but the Court has no need to address that contention at this time. As Mr. Brown was only one of five criminal defendants, his plea does not materially affect the factual background against which the motions here are being decided, or this Court's analysis of the issues.

*Proceedings In This Case to Date*

On March 27, 2002, ABIZ and its subsidiaries filed voluntary chapter 11 petitions in the Southern District of New York, and those cases were assigned to this Court.

On June 25, 2002, about two weeks after a chapter 11 filing by one ACC subsidiary (which was filed as a related case to the ABIZ cases), ACC and about 200 other subsidiaries filed for relief under chapter 11 in the Southern District of New York. These likewise were filed as related cases, and these cases too were assigned to this Court. Each of ABIZ and ACC continues to operate its business as a debtor in possession. ABIZ has an active Creditors' Committee, and ACC has active Creditors' and Equity Committees, all of which have weighed in on the pending motions.

On September 13, 2002, the Rigas Family filed the first of the motions that are before the Court, seeking relief from the automatic stay, to the extent applicable, to allow payment and/or advancement of defense costs under the D & O Policies. On September 24, 2002, James Brown filed a similar motion.

On September 23, 2002, AEGIS sought to rescind the AEGIS Policy, and sent notices of rescission with respect to it, as to former directors and officers John, Timothy, Michael and James Rigas, Peter L. Venetis, Michael Mulcahey and James Brown. The same day, September 23, Federal sought to rescind the Federal Policy, and sent out notices of rescission with respect to it, as to the same seven former directors and officers and six more—Independent Directors Dennis P. Coyle, Leslie J. Gelber, Erland E. Kailbourne and Pete J. Metros, along with Daniel Milliard, and John Glicksman. Two days later, by letter dated September 25, 2002, Greenwich likewise notified these thirteen individuals of its intent to seek rescission of the Greenwich Policy.

---

**10.** Also on July 24, 2002, the Securities and Exchange Commission filed a lawsuit against ACC and the same five former officers seeking, among other things, disgorgement of allegedly ill-gotten gains and civil monetary penalties.

On September 24, 2002, the Insurers brought the Declaratory Judgment Action, against each of the directors and officers as to whom the Insurers had sought rescission. In the Declaratory Judgment Action, AEGIS sought a declaration that its policy was rescinded and void *ab initio* with respect to the Rigas Insureds and Mr. Venetis, and Federal and Greenwich sought declarations that their policies were rescinded and void *ab initio* in their entirety. In the alternative, the Insurers sought a declaration that the Policies do not provide coverage for any lawsuits brought against these individuals relating to the mismanagement and "looting" of ACC.

Two days later, on September 26, 2002, the Insurers brought motions in each of the ACC and ABIZ cases for relief from the automatic stay, if applicable, so they could (1) provide ACC and ABIZ with notices of rescission of the D & O Policies and (2) join ACC and ABIZ as defendants in the Declaratory Judgment Action.

In response to the Insurers' Lift Stay Motion, on October 16, 2002, ACC initiated an adversary proceeding in the ACC case by filing a complaint against the Insurers, seeking to enjoin the continued prosecution of claims in the Declaratory Judgment Action. It also sought an order staying the continuation of the Declaratory Judgment Action, under each of Bankruptcy Code sections 362 and 105(a).

Five days later, the Independent Directors filed the first of two submissions with respect to the Rigas Insureds' lift stay motion. They stated:

> Accordingly, to the extent the automatic stay applies to payments properly made to the Independent Directors from the D & O Policies, which the Independent Directors do not concede is the case, it only should be lifted in order to allow the Independent Directors to receive reimbursement of their defense costs relating to claims covered by the D & O Policies.

(Independent Directors' Memo # 1 ¶ 14).

The Independent Directors thereafter made an additional submission. They then stated, with respect to their earlier submission:

> In response to certain characterizations of the Independent Directors' Objection by the insurance carriers and ABIZ, the Independent directors also point out and clarify that in the Independent Directors' Objection, the Independent Directors did not formally move for any relief. Rather, the Independent Directors simply stated that if the automatic stay applies it should only be lifted to allow reimbursement of the Independent Directors' defense costs (as opposed to the defense costs of former directors and officers implicated in wrongdoing).

(Independent Directors' Memo # 2 ¶ 3).

## Discussion

### I.

### Need for Relief from Stay

A threshold matter, relevant as each of the Rigas Insureds and the Insurers sought relief from the stay "to the extent necessary," is whether the automatic stay does in fact apply, and whether relief from the stay is necessary. The Court's analysis in this regard (and others) is aided substantially by recent extensive analysis of the law in this area, particularly in the reported decisions in *Ochs v. Lipson (In re First Central Financial Corp.),* 238 B.R. 9 (Bankr.E.D.N.Y.1999) (Feller, J.), *aff'd in unreported opinion,* No. 99–CV–6730 (TCP) (E.D.N.Y. Mar. 2, 2000) ("*First Central Financial*"), and *In re CyberMedica, Inc.,* 280 B.R. 12 (Bankr.D.Mass.2002) (Rosenthal, J.) ("*CyberMedica*"). The

Court concludes that relief from the stay is indeed necessary, for both the Rigas Insureds' and the Insurers' requests, albeit for different reasons.

### A.

■ Section 362 of the Bankruptcy Code provides, in relevant part, that the automatic stay which is imposed as of the petition date stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." Bankruptcy Code section 362(a)(3), 11 U.S.C. § 362(a)(3). Property of the estate is defined as "all legal or equitable interests of the debtor in property as of the commencement of the case," section 541(a)(1), 11 U.S.C. § 541(a)(1), and the legislative history makes it plain that section 541's scope is broad, including all kinds of property, including tangible or intangible property. *See, e.g., CyberMedica,* 280 B.R. at 15 (starting relief from stay analysis with these observations). The need to seek relief from the stay must be analyzed in this context.

### B.

■ The easier matter is the request by the Insurers for leave to name ACC and ABIZ as defendants in the Declaratory Judgment Action. Insurers Federal and Greenwich seek rescission of the policies they issued in their totality, and AEGIS seeks it as to coverage for ACC. If they were successful, the policies they issued would come to an end, and would, from the perspective of the two chapter 11 estates, be destroyed. The parties do not dispute, understandably, that insurance policies are property of the estate. *See, e.g., MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.),* 837 F.2d 89, 92 (2d Cir.1988); *Louisiana World Exposition, Inc. v. Federal Insurance Co. (In re Loui-*

*siana World Exposition, Inc.),* 832 F.2d 1391, 1399 (5th Cir.1987) (*"Louisiana World"*); *Minoco Group of Companies, Ltd. v. First State Underwriters Agency of New England Reinsurance Corp. (In re The Minoco Group of Companies, Ltd.),* 799 F.2d 517, 519 (9th Cir.1986) (*"Minoco"*); *A.H. Robins Co., Inc. v. Piccinin (In re A.H. Robins Co., Inc.),* 788 F.2d 994, 1001 (4th Cir.1986); *In re Davis,* 730 F.2d 176, 184 (5th Cir.1984); *CyberMedica,* 280 B.R. at 16; *First Central Financial,* 238 B.R. at 9. That principle has been applied in the specific context of D & O insurance policies, and numerous courts have held that those policies (as contrasted to their proceeds, a matter that raises different issues) are property of the estate under section 541. *See, e.g., Minoco,* 799 F.2d at 519–520; *CyberMedica,* 280 B.R. at 16; *First Central Financial,* 238 B.R. at 16.

Here one purpose of the Declaratory Judgment Action is rescission of the D & O Policies, as against each of the debtors ACC and ABIZ, which would have both the purpose and effect of bringing the policies to an end—all of which at the least is an attempt to exercise control over property of the estate. *See Minoco,* 799 F.2d at 519 (affirming determinations by bankruptcy court and district court that cancellation of D & O policy was stayed under section 362(a)(3)). Litigants may debate, if relief from the stay is sought in a given case, whether relief should be granted, but this Court agrees with the *Minoco* court that section 362(a)(3) applies, and that litigation to cancel or rescind a policy requires an application for relief from the stay.

### C.

■ While the matter is closer, the Court likewise concludes that a request for relief from the stay is required to lay claim to D & O policy proceeds, at least under

the facts here. As noted by the *CyberMedica* court, *see* 280 B.R. at 16, courts are in disagreement as to whether insurance *proceeds*—as contrasted to the policy itself—are property of the estate, though their different conclusions frequently can be attributed to different facts. In *Louisiana World*, a chapter 11 case where the estate had no claim on the policy proceeds, the Fifth Circuit held, understandably, that the D & O policy's proceeds were not property of the estate. *See* 832 F.2d at 1400–1401. And in *First Central Financial*, a chapter 7 case, where the debtor had a theoretical right to entity coverage, but where no claims that would trigger such coverage had been filed, the court held, understandably, that the estate lacked a sufficiently material interest in the D & O policy proceeds to warrant considering such proceeds to be property of the estate. *See* 238 B.R. at 17–18.

By contrast, where the debtor has had a material interest in the proceeds of D & O policy for its own economic exposure—e.g., by way of reimbursement for any indemnification payments it might make, or for "entity coverage," satisfying issuer obligations on account of securities fraud liability—courts have recognized the interest of the debtor in the policy proceeds as well as the policy itself, with the result that the proceeds too are property of the estate. *See, e.g., Homsy v. Floyd (In re Vitek)*, 51 F.3d 530, 535 (5th Cir.1995) (*"Vitek"*); *In re Leslie Fay Companies, Inc.*, 207 B.R. 764, 785 (Bankr.S.D.N.Y.1997) (Brozman, C.J.); *CyberMedica*, 280 B.R. at 16–17; *In re Sacred Heart Hospital of Norristown*, 182 B.R. 413, 419–420 (Bankr.E.D.Pa. 1995). (*"Sacred Heart Hospital"*).[11] The *CyberMedica* court was plainly correct when it said "[w]hether the proceeds of a D & O liability insurance policy is property of the estate must be analyzed in light of the facts of each case." 280 B.R. at 16.[12]

Here the parties objecting to the Rigas Insureds' request for relief from the stay—the debtors ACC and ABIZ, the Creditors' Committee and Equity Committee in ACC, and the Creditors' Committee in ABIZ—rely on the latter line of cases,

**11.** Underscoring the distinction, the Fifth Circuit in *Vitek*, a chapter 7 case, noted that, at one extreme, when a debtor corporation owns a D & O policy that *exclusively* covers its directors and officers, the proceeds of that policy are *not* part of the bankruptcy estate, and at the other extreme, when it had such a policy that covered its own liability vis-a-vis third parties, the proceeds would be estate property too. *See* 51 F.3d at 535. But noting that while it was in the position of knowing "how to resolve cases on either end of the continuum," the Fifth Circuit thereafter stated:

But we have not yet grappled with how to treat the proceeds of a liability policy when (1) the policy-owning debtor is but one of two or more coinsureds or additional named insureds, (2) the rights of the other coinsured(s) or additional named insured(s) are *not* merely derivative of the rights of one primary named insured, and (3) the aggregate potential liability substantially exceeds the aggregate limits of available insurance coverage.

*Id.* (emphasis in original; footnotes omitted). The Fifth Circuit noted "[w]hen ultimately we are faced with such a mid-continuum case," it would have to decide whether to wholly include the proceeds in the debtor's bankruptcy case (even though there would be other co-insureds with an interest in the proceeds) or somehow divide the proceeds among all coinsureds (either per capita or in proportion to potential or actual liability), but that the case then before it was not one that forced it to decide which of those or possibly other positions to take. *Id.*

This "mid-continuum case" is, of course, exactly what we have here.

**12.** *See also Leslie Fay*, 207 B.R. at 785 n. 30 (referring the reader to an "analytical discussion on the inherent flaw in having a *per se* rule either way with respect to the characterization of insurance proceeds").

and observe that the D & O Policies here provide at least two benefits, with respect to their policy proceeds, to the debtors themselves in addition to their officers and directors. The D & O Policies provide "entity coverage," protecting each estate on account of its exposure as issuer to securities law claims.[13] The D & O Policies also reimburse each estate to the extent that the estate advances funds by reason of indemnification obligations in its charter or by-laws. Those showings, the objectors argue, are exactly the kinds of showings that have been held to be sufficient to make policy proceeds property of the estate.

The Court agrees that these showings are indeed the exact kinds of showings that have been held to warrant holdings that policy proceeds are property of the estate.[14] However, under the facts of this case, there is another factor that is also important in causing this Court to conclude that relief from the stay is necessary to access policy proceeds here. It is the concern, articulated most forcefully by ABIZ and its Creditors' Committee, that by reason of the need to secure indepen-

dent directors and officers who are willing to serve, and their legitimate desire to have D & O policy protection when continuing to serve, simply *having* a D & O policy is an important need of any company wishing to reorganize[15]—and that the unfettered resort to policy proceeds by some insureds under the policies could result, as a practical matter, in the total depletion of the policies, with the result that they are no longer available to give directors and officers the comfort they need to serve or continue to serve. The problem is aggravated by the fact (put forward by ABIZ without contradiction) that ABIZ has tried and failed to get a new D & O policy, and necessarily must rely on its existing ones.

■ The concern, then, is that an excessive drain on D & O policy proceeds could make the policy itself evaporate, and thereby deprive a debtor trying to reorganize of an asset that it needs to secure independent directors—an injury to the debtor itself, and, quite possibly, an injury more severe than the loss of indemnification rights or entity coverage. To be sure,

**13.** That coverage is rarely meaningful in bankruptcy cases (even in chapter 11 cases), because under section 510(b) of the Code, claims for securities fraud—claims "arising from rescission of a purchase or sale" of a security, or for damages arising from such— are subordinated to claims that are senior or equal in priority, and since there are rarely enough assets to pay all creditors in full, debtors rarely are in a position (and do not have a need) to make distributions on more junior claims. Here, however, in the ACC case, there is some reasonable basis for the hope that creditors will be paid in full, and entity coverage may be more significant.

**14.** That, of course, merely means that where facts like these are present, persons wishing *access to policy proceeds—such as individuals* wishing defense costs to be advanced—must seek relief from the stay. It is not determinative of whether relief from the stay should be

granted. *CyberMedica* makes that distinction clear—requiring a request for relief from the stay to access policy proceeds, and then granting such a request. *See* 280 B.R. at 17– 18.

**15.** The Court has no occasion now to express a view as to whether these concerns and this analysis would also apply to a case, like *CyberMedica* or *First Central Financial,* in chapter 7, where the debtor is not continuing in operation, and/or where it has no material interest in future coverage under the D & O policy. They might not. *Cf. Vitek,* 51 F.3d at 533 & n. 3 (noting, with respect to its analysis of "the interfacing of federal bankruptcy law and state insurance law" in a chapter 7 case, that "any analogical crossovers into Chapter 11 jurisprudence is problematical," and that "the precedential—or even merely instructional—value of this opinion to future Chapter 11 cases should probably be 'little or none' ").

this argument could prove too much, and courts should be wary of accepting it in every case—for in many cases the debtor might not have a material continuing need for coverage, and most prospective (or present) directors, and debtors, would agree with the important observation in *First Central Financial,* as does this Court, that "[i]n essence and at its core, a D & O policy remains a safeguard of officer and director interest and not a vehicle for corporate protection." 238 B.R. at 16; *accord In re Youngstown Osteopathic Hospital Ass'n,* 271 B.R. 544, 551 (Bankr. N.D.Ohio 2002) (Bodoh, J.) ("Youngstown Osteopathic") (noting that it was persuaded by *First Central Financial* analysis, which it quoted); *CyberMedica,* 280 B.R. at 16–17 (citing *Youngstown Osteopathic* and *First Central Financial*). But there may be cases, and this may be one of them, where the distinction between policy proceeds and the policy itself becomes blurred, and where resorting to proceeds may have the effect of destroying the practical value of the policy. Where, as here, there is that risk, a request for relief from the stay, providing the Court with a means to balance the competing needs and concerns, is even more necessary.

As the *CyberMedica* court noted, citing *Minoco,* an important factor is whether the estate is worth more with the D & O policy than without it. *See* 280 B.R. at 17. Here the ACC estate is worth more with the D & O Policy than without it by reason of the entity coverage, and the ABIZ estate is worth more with the D & O Policy by reason of the amalgam of the entity coverage and the need for the policy itself to secure independent directors. Under the facts of these cases, then, the proceeds of the D & O Policies are, like the policies themselves, property of the estate, and requests by insureds to draw down on policy proceeds do indeed require motions for relief from the stay.

## II.

### Motions for Relief from the Stay

■■■ Bankruptcy Code section 362(d)(1) provides, in relevant part, that

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest. . . .

11 U.S.C. § 362(d)(1). The decision of whether to lift the stay is committed to the discretion of the bankruptcy judge. *See Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Industries, Inc.),* 907 F.2d 1280, 1286 (2d Cir.1990) ("Sonnax"). Courts in the Second Circuit exercise their discretion in accordance with factors articulated by the Second Circuit Court of Appeals in *Sonnax,* a decision of particular relevance to requests for relief from the stay to proceed with plenary litigation.

In *Sonnax,* the Second Circuit, drawing on earlier analysis in *In re Curtis,* 40 B.R. 795 (Bankr.D.Utah 1984), identified a dozen factors to be weighed in deciding whether litigation should be permitted to continue in another forum. These were: (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third

parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms. 907 F.2d at 1286.

### A.

The requests for relief from the stay, by each of the Insurers and the Rigas Insureds, raise issues of two types, the first of which is common to both groups of movants, and the latter of which is applicable to the insureds only. The issues of the first type, relating to leave to litigate with respect to coverage, raise classic *Sonnax* issues, and the issues of the second type relate to insureds' access to D & O policies generally in the context of bankruptcy cases. The two types of issues will be considered in turn.

#### 1. Leave to Litigate* with Respect to Coverage

■ When the motions were originally filed, and during much of the briefing, there was a difference of views between the Insurers and the Debtors; thereafter, ACC and the Insurers agreed on a consensual resolution of the Insurers' request—with an understanding that the Insurers would not press their request for relief from the stay, so long as they were not faulted for failing to pay under the D & O Policies until they ultimately had their day in court.[16] However, this resolution has been opposed by the Rigas Insureds, who (believing that the Insurers will not pay anything on account of Rigas Insureds defense costs in the absence of a court order requiring such) wish the Insurers' claims, and their claims, to be litigated without delay.

These requests—which contemplate litigation that is initially barred by the automatic stay for the reasons described above—raise classic *Sonnax* issues. As in many *Sonnax* determinations, several of the factors, in this Court's view, here have no applicability at all.[17] Others, which when present militate in favor of relief from the stay, are not present here.[18] Another [19] is a factor which may militate against relief from the stay, but which, given the remaining factors, is not sufficiently material to the matter at this time for the Court to prejudge. The remain-

**16.** The Court does not understand that ABIZ formally agreed as well to this approach, but does not understand ABIZ to have opposed it.

**17.** These include "(3)," whether the other proceeding involves the debtor as a fiduciary (as the matter in controversy does not involve property held by the debtor in a fiduciary capacity); "(8)," whether the judgment claim arising from the other action is subject to equitable subordination; and "(9)," whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor.

**18.** These include "(1)," whether relief would result in a partial or (particularly) complete resolution of the issues; "(2)," lack of any connection with or interference with the bankruptcy case; "(4)," whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; "(5)," whether the debtor's insurer has assumed full responsibility for defending it; "(6)," whether the action primarily involves third parties, and "(11)," whether the parties are ready for trial in the other proceeding.

**19.** This is "(7)," whether litigation in another forum would prejudice the interests of other creditors.

der,[20] which in this case (and at this time) are the most important, strongly tilt toward denial of stay relief to engage in civil litigation at this time, and the denial of both the Insurers' and the Rigas Insureds' requests.

Relevant in particular to the consideration of the remaining factors is the fact, as noted above, that James, Timothy and Michael Rigas, Michael Mulcahey, and James Brown are defendants in pending criminal proceedings, which inevitably impact on civil litigation which raises overlapping, even if not wholly identical, issues. The United States Government might wish to assert that, so long as the criminal proceedings are ongoing, civil litigation not be used as a means to provide broader discovery than that available in criminal cases. The Rigas Insureds who are under indictment would have a constitutional right to invoke their privilege against self-incrimination, which would tend to decrease the pool of available evidence, and raise complicating issues, in any civil litigation, of arguable issue preclusion. It is at least possible that determinations in the criminal proceedings, pleas, statements made in connection with pleas, or evidence adduced in the criminal proceedings could be relevant to disputed matters in connec-

tion with rescission/coverage litigation, though this Court expressly makes no determination beyond noting these matters as possibilities. It is likely, however, that any civil litigation will proceed much more expeditiously after the conclusion of the criminal proceedings, and it is at least possible that any ensuing litigation will take a different course after one or more acquittals in the criminal proceedings, on the one hand, or one or more convictions in those proceedings, on the other.[21]

The United States Attorney has sought to stay other civil litigation that might adversely affect the criminal proceedings, and it is at least foreseeable, if not likely, that he would do so here as well if litigation with respect to insurance coverage issues—which are inextricably intertwined with issues relating to alleged actions by the Rigas Insureds—were to proceed. Given that, and Fifth Amendment issues, there is little assurance that insurance coverage litigation could proceed even if this Court were to vacate the stay to allow it to proceed. The Rigas Insureds might well be able to articulate their defenses more easily if they did not have a criminal cloud and Fifth Amendment concerns hanging over their heads, and while the Court is

20. "(10)," the interests of judicial economy and the expeditious and economical resolution of litigation and "(12)," impact of the stay on the parties and the balance of harms.

21. It should be noted that the Court is not basing its determination now on the seriousness of the allegations or, especially, on the views on the part of parties-in-interest that Rigas Insureds are guilty, even though it is true, as this Court noted previously, that "if any more than a bare minimum of the allegations that have been made turn out to be true, we will here be faced with very major breaches of fiduciary duty." Oral Decision, Tr. of Hrg. of Aug. 26, 2002 (ECF # 881 Exh. 4), *In re Adelphia Communications Corp.*, Case No. 02–41729(REG), at 3. The fact that allegations have not been proven is more than a "techni-

cal consideration[ ]," and this Court, like most bankruptcy courts, is ill-suited to conducting mini-trials on insureds' culpability incident to determining their entitlement to relief from the stay on access to the D & O policy proceeds that were put in place, at least in part, to help them in litigation to determine that very issue. There is always a danger, in depriving insureds of the funding they need to defend themselves, that predictions of their culpability could become a self-fulfilling prophecy.

If, as we have now seen with Mr. Brown, there are guilty pleas, or if, as may (but not necessarily will) occur, there are criminal convictions, parties may hereafter argue the implications of such.

well aware that they are nevertheless seeking the opportunity to litigate this way even with such concerns, and that they are not asking for this Court's protection in this regard, ACC and ABIZ may be the victims of any such decision, along with the Rigas Insureds themselves.

The balance of hardships, which not infrequently favors relief from the stay, does not do so here, when one considers the realities of trying to move the civil litigation while the criminal proceedings are ongoing. While undoubtedly the Rigas Insureds will be disadvantaged by the combination of a refusal on the part of the Insurers to fund defense costs and an inability to obtain a court order to the contrary by litigation, there is little likelihood that they could move any insurance-related civil litigation forward anyway while the criminal proceedings are ongoing. A significant portion, even if not all, of the non-insurance actions they would need to defend would likewise not be proceeding in any material way while the criminal proceedings are ongoing. And while the Court is not so naive as to assume that all defense activities stop while civil litigation is stayed, it probably is the case that defense lawyers will not be running their meters as fast when litigation is stayed as when it is moving forward at the usual speed. At the same time, ACC and ABIZ might be prejudiced if their interests (and the interests of independent directors that they need for their respective reorganizations) had to be litigated while Rigas Insureds were invoking Fifth Amendment rights.

In many cases, officer or director insureds might be severely prejudiced by a refusal to grant relief from the stay to recover defense costs.[22] But this concern, which normally would be a very important one for the Court, is ameliorated here by the limitations that would likely be in place anyway on the progress of the non-insurance litigation that has been commenced, and by the inability quickly to address the Rigas Insureds' concerns even if this Court were to grant relief from the stay to allow the Declaratory Judgment Action to proceed while criminal proceedings are still underway.

All of these factors tilt strongly in favor of denial of relief from the stay at this time, with respect to all insurance-related litigation, whether sought by the Insurers or the Rigas Insureds, without prejudice to reconsideration after the conclusion of the criminal proceedings, at which time the relevant facts may at least arguably be different.

### 2. Leave to Request Payment, and for Authorization for Voluntary Payment

To the extent litigation is not implicated, particularly with respect to the conduct of the Rigas Insureds, different considerations apply. They involve the extent to which the Court should interfere with the expectations of insureds under D & O policies to receive their direct entitlements under D & O policies to defense costs and payments on account of liability, when a bankruptcy estate, by reason of indemnity coverage or entity coverage, has a competing claim to it.[23]

---

**22.** *See, e.g., CyberMedica,* 280 B.R. at 18 ("This Court further finds that there is cause to lift the automatic stay because Dr. Hotchkiss and Mr. Vilar [director and officer direct insureds under the D & O policies there] may suffer substantial and irreparable harm if prevented from exercising their rights to defense payments. Dr. Hotchkiss and Mr. Vilar are in need *now* of their contractual right to payment of defense costs and may be harmed if *disbursements are not presently made to fund* their defense of the Trustee's Complaint") (emphasis in original).

This issue is the one identified but unanswered in *Vitek.*[24] However, courts have recently started to confront the issue, most notably the courts in *First Central Financial, Youngstown Osteopathic, CyberMedica,* and two others, *In re Enron Corp.*, 2002 WL 1008240, 2002 Bankr.LEXIS 544 (Bankr.S.D.N.Y. May 17, 2002) (Gonzalez, J.) (*"Enron"*), and *Executive Risk Indemnity, Inc. v. Boston Regional Medical Center, Inc. (In re Boston Regional Medical Center, Inc.)*, 285 B.R. 87 (Bankr.D.Mass. 2002) (Kenner, J.) (*"Boston Regional Medical Center"*).

In each of the cases mentioned above, the estate had at least theoretical claims on the policies: for indemnification, entity coverage, or both.[25] But in all but one of those cases, notwithstanding claims by the estate on the policies in parallel with director and officer insureds, the court did not permit the estate's claims to block the director and officer insured's effort to secure policy proceeds for defense costs— and in the one remaining case[26] it did not

do so wholly. The *First Central Financial* court noted:

> *D & O policies are obtained for the protection of individual directors and officers. Indemnification coverage does not change this fundamental purpose.* There is an important distinction between the individual liability and the reimbursement portions of a D & O policy. The liability portion of the policy provides coverage directly to officers and directors, insuring the individuals from personal loss for claims that are not indemnified by the corporation. Unlike an ordinary liability insurance policy, in which a corporate purchaser obtains primary protection from lawsuits, a corporation does not enjoy direct coverage under a D & O policy. It is insured indirectly for its indemnification obligations. *In essence and at its core, a D & O policy remains a safeguard of officer and director interests and not a vehicle for corporate protection.*

238 B.R. at 16 (emphasis added). The *First Central Financial* court's analysis in

---

23. The Court assumes that the ACC estate will have a competing claim to it. One of the Insurers' contentions is that by reason of alleged fraud and/or wrongful activity on the part of one or more of the Rigas Insureds, ACC forfeited the right to its entity coverage. This is a matter that the Court does not now address on the merits; it assumes, for the sake of discussion, that ACC will have a claim to entity coverage, and that ABIZ, which, so far as the Court is aware is not alleged to have acted wrongfully but whose policy may arguably be subject to rescission by reason of acts of people at ACC, is in the same position.

24. *See* n. 11 above.

25. *See CyberMedica*, 280 B.R. at 14 (indemnification and entity coverage); *First Central Financial*, 238 B.R. at 13–14 (indemnification and entity coverage, though there had been no claims filed against the debtor that would trigger entity coverage, and the court was skeptical that any would be filed); *Youngs-*

*town Osteopathic*, 271 B.R. at 546–547 (indemnification coverage); *Boston Regional Medical Center*, 285 B.R. at 89 (indemnification coverage). In *Enron*, the court did not stand in the way of a request for payment of defense costs when the insurers were prepared to advance them. Only the court's order was reported on Lexis, but review of the transcript of the court's bench decision, available through the Southern District of New York Electronic Case Filing System, reveals that there, while the debtors did have entity coverage (as well as indemnification coverage), the relevant policy had a "priority of payments" endorsement, under which that coverage was expressly subordinated to the rights of the directors and officers under the policy. *See* Oral Decision, Tr. of Hrg. of Apr. 11, 2002 (ECF # 3278), *In re Enron Corp.*, Case No. 01–16034(AJG), at 13.

26. *Boston Regional Medical Center*, discussed at some length below.

this respect was expressly endorsed by the courts in *Youngstown Osteopathic, see* 271 B.R. at 550, and *CyberMedica,* 280 B.R. at 16–17.

In each of *First Central Financial*[27] and *CyberMedica,*[28] while the estate had entity coverage as well as indemnification coverage, there was no reasonable basis for a view that the estate would need its entity coverage, and in *Youngstown Osteopathic* there was indemnification coverage only, which likewise was not needed.[29] In *Enron,* the indemnification and entity coverage was contractually subordinated to the defense costs coverage, making that an even easier case. Thus each of those cases was arguably distinguishable from these cases, or at least ACC's, where entity coverage may ultimately be more significant. Nevertheless, the Court believes that the observation made by the *First Central Financial* court, and endorsed in *Youngstown Osteopathic* and *CyberMedica,* that "in essence and at its core, a D & O policy remains a safeguard of officer and director interests and not a vehicle for corporate protection," is true—and that bankruptcy courts should be wary of impairing the contractual rights of directors and officers even in cases where the policies provide entity coverage as well. The Court believes that if directors and officers are to serve, they need to have comfort in knowing that bankruptcy courts will be slow in depriving them of contractual rights under the D & O policies upon which they may have relied in agreeing to serve.

That being said, the Court recognizes that here there are conflicting needs that also must be taken into account. One is the interest of ABIZ in protecting like concerns of its own directors, and in ensuring that the entirety of the proceeds of policies in which ABIZ claims an interest will not be depleted before the Court can determine whether ABIZ has the separate share of coverage it claims. Another is that wholly uncontrolled access to the D & O Policies could impair ACC's interests by depriving it of entity coverage, in this unusual case where ACC could have enough value to make entity coverage significant. A third is that even amongst the director and officer insureds—which includes the Rigas Insureds, the Independent Directors and insured directors and officers of ABIZ—there may be conflicting claims to payment on the D & O policies, including with respect to defense costs, and that this Court should, so far as possible, try to avoid prejudice to any of them. The Court does not need to decide now whether and

---

27. *See* 238 B.R. at 17–18 ("the estate is in no need of protection. During the eighteen months this bankruptcy case has been pending, there have been no claims filed against the Debtor which would implicate the narrow scope of the Policy's entity coverage.... Nor has the Trustee intimated that any action against the Debtor is imminent or likely.... If entity coverage is hypothetical and fails to provide some palpable benefit to the estate, it cannot be used by the trustee to lever himself into a position of first entitlement to policy proceeds").

28. *See* 280 B.R. at 18 ("there are presently no claims for indemnification nor entity coverage ...").

29. *See* 271 B.R. at 550 ("YOH [Youngstown Osteopathic Hospital] has not paid any of Defendants' defense costs, and so it is not entitled to be reimbursed").

The *Youngstown Osteopathic* court noted that Youngstown Osteopathic Hospital did not have entity coverage, which would directly insure it, and that "[t]his Court makes no legal conclusions regarding entity coverage, other than to find that YOH had none and that the existence of entity coverage could change this Court's analysis." 271 B.R. at 550–551.

to what extent it would allow those concerns to trump the D & O policies' insureds' rights, because at this point it can reconcile the competing concerns. The Court believes that it is appropriate at this juncture to authorize the Insurers to advance defense costs in a way that would at least initially meet the needs and concerns of director and officer insureds, while permitting the Court to maintain control, and permitting it to provide notice and opportunity to be heard if and when the Court must confront the most difficult issues.

The *Boston Regional Medical Center* court was faced with similar issues. There, where it appears that under the D & O policy in that case, the debtor did not have entity coverage, but did have coverage for indemnification payments that the debtor made, the court observed:

> What interest, if any, does [the debtor] BRMC have in the policy proceeds? The property interest at issue in this proceeding is a contract right, BRMC's right under the policy to coverage for its indemnification obligations. No one denies that BRMC has a right to such coverage. The problem is that other insureds also have rights to coverage, and that total claims for coverage may exceed the policy limit of $20 million, such that not all claims can be paid in full. When claims for coverage exceed the policy limit, payment of any one's claim in full necessarily reduces the val-

ue of the claims of the others (at least as a group): they, as a group, will be paid a lesser percentage of their claims than if the payment had not been made and all claims had shared equally in the whole pool of proceeds.

285 B.R. at 95.

The litigants in *Boston Regional Medical Center* had not cited any provisions in the D & O policy, in state law, or in separate agreement among the insureds that would determine their conflicting rights under the policy, and in the absence of such, the *Boston Regional Medical Center* court determined, preliminarily, that the rights of coverage must be assumed to be equal. It then authorized the use of D & O policy proceeds for defense, but subject to a cap, so that the proceeds so applied would not wholly deplete the policy, or impair the rights of the litigants to share pro-rata, or as the court might thereafter determine.[30] While the *Boston Regional Medical Center* court recognized that the proposed distribution could harm the debtor, the harm would not be as severe as the harm that would befall the director and officer insureds if the proposed payments were not made. *Id.* at 98.

That was a thoughtful, and common sense, approach, and the Court believes that a variant of it, applied to the facts of these cases, is appropriate here. This

---

**30.** Accordingly, the *Boston Regional Medical Center* court authorized payment of $600,000 on a policy with $20 million limits, for expert costs. In doing so, it observed:

> First and foremost, the proposed payment is relatively small in proportion to the policy limit—approximately one-fortieth of total proceeds—and surely will not be the last coverage demanded by the insureds for whose benefits the proposed payments are to be made. If total claims against the policy ultimately exceed the

policy limit, the share paid to the various insureds can be equalized by withholding payment (or some fraction thereof) on later claims from those who have already received coverage in order to fund the pro rata share of those who have not already received coverage.

*Id.* at 97. The *Boston Regional Medical Center* court noted that it had the ability to reach a just result because the proposed distribution represented a small percentage of the total proceeds. *Id.* at 97 n. 11.

Court is loath to allow the estates' claims for entity or indemnification coverage— especially since such coverage may or may not ever be drawn upon—wholly block the contractual rights of director and officer insureds under the D & O Policies.

While up to this point, the litigants in these cases, like those in *Boston Regional Medical Center,* have not proffered specific approaches to allocate the proceeds under state law or by agreement, this Court believes that it is unlikely that it ever could properly conclude that the entity coverage needs of the estates wholly take priority over the direct contractual rights of the D & O policies' insureds. If there were no entity coverage present here (or if it were later determined to have been forfeited), this Court would be inclined to take the *CyberMedica–Enron* approach, and allow unfettered access to the D & O Policies for the director and officer insureds. But given the presence of entity coverage here, at least at this juncture, this Court believes that the best way to balance the competing claims at this time, while still staying true to the goal of giving officers and directors the D & O policy protection upon which they may have relied, is to allow, as the *Boston Medical Regional Center* court did, meaningful payments on account of defense costs, but still subject to limits that preserve the bulk of the policies' proceeds, without prejudice to parties' rights in further proceedings down the road.[31] The Court authorizes the Rigas Insureds (and, subject to the procedures set forth in n. 3

above, is prepared to authorize all insureds) to request, and authorizes the Insurers to pay, up to $300,000 per insured on account of defense costs, without prejudice to further requests, and without prejudice to the rights of the parties later to litigate whether, and to what extent, alternative mechanisms should be put into place to allocate the policy proceeds, and to address any situation (which the Court regards as unlikely) in which any insured has been advanced more than his or her rightful share. This approach also meets the needs and concerns of ABIZ, by ensuring that the amounts now advanced will not be so great as to impair the rights, if any, that ABIZ can establish in its pending adversary proceeding with ACC to carve out its claimed share of the D & O Policies' proceeds.

### III.

#### *Motion to Enforce and/or Extend the Section 362 Stay*

■ This analysis need not be lengthy by reason of the agreement between ACC and the Insurers, and the analysis set forth in Section II(B)(1) above. It is not clear whether the Insurers would wish to proceed with the Declaratory Judgment Action in the absence of ACC and ABIZ, and it is not clear to the Court whether or to what extent the Declaratory Judgment Action would impact adversely on ACC and ABIZ if it were to proceed in their absence,[32] but the risks of results that are

---

**31.** The *Boston Regional Medical Center* court thought that pro-rata might be the fairest way to do it, which was one of a few different approaches noted in *Vitek.* But as the *Vitek* court noted, it was not the only possible way to do it. The *Boston Regional Medical Center* court kept its options open in this regard, and this Court believes that it should too. This Court's approach allows payments to be made on account of defense costs in a way that permits litigants later to argue in favor of

whatever approaches they believe are correct, and to make arguments with respect to the construction and significance of the allocation of payment endorsement.

**32.** The Court is at the least uncertain that principles of collateral estoppel or *res judicata* would apply against ACC or ABIZ if ACC and ABIZ were not named as defendants in the Declaratory Judgment Action, but does not have to reach this issue now.

adverse to their estates, coupled with the high degree of probability that the Declaratory Judgment Action could not proceed in any meaningful way anyway while the criminal proceedings are ongoing, strongly dictate that the Declaratory Judgment Action not proceed now in any fashion. Although it is well established that the automatic stay provisions of the Bankruptcy Code protect debtors and not non-debtors, *see Teachers Insurance & Annuity Ass'n of America v. Butler,* 803 F.2d 61, 65 (2d Cir.1986) *("TIAA–Butler"),* they also protect debtor property, and the Court believes that the discussion above, particularly the factors discussed above in section I(A), in connection with the Court's conclusion that the policies are property of the estate, makes this case potentially one of those few cases, involving "unusual circumstances," where section 362 itself applies, even without application of the section 105(a) power. *See A.H. Robins Co. v. Piccinin (In re A.H. Robins Co.),* 788 F.2d 994, 999 (4th Cir.), *cert. denied* 479 U.S. 876, 107 S.Ct. 251, 93 L.Ed.2d 177 (1986) (the required unusual circumstances may exist when there is such identity between the debtor and the third-party defendant that the debtor may be said to be real party defendant, and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor).[33] The Declaratory Judgment Action will be stayed at this time, subject to reconsideration at the conclusion of the criminal proceedings. At the conclusion of the criminal proceedings, when the purpose, effect and manner as to which the Insurers propose to proceed is clarified, the parties will have a further, and more useful, opportunity to be heard.

The corollary of this, of course, is that the Insurers may not be criticized for failing to make payments on the D & O Policies here after they have attempted, in good faith, to litigate their duty to do so, and the Court has placed impediments in their way. This Court believes that they cannot be faulted for first wishing their day in court.

### Conclusion

For the foregoing reasons, the motions are granted to the extent, but only to the extent, and subject to the conditions, set forth herein.

SO ORDERED.

---

**33.** The Second Circuit acknowledged the *A.H. Robins* exception, "in unusual circum- stances," in its decision in *TIAA–Butler. See* 803 F.2d at 65.